308 Ga. 589
FINAL COPY

S20A0022.  CARTER v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Brandon Carter was convicted of malice murder and two firearm offenses in connection with the shooting death of Terrance Baker. Appellant contends that the trial court erred by admitting certain hearsay statements into evidence and by violating his constitutional right to be present during his trial. Seeing no reversible error, we affirm.[1]

---

[1] Baker was killed on February 16, 2016. On May 10, 2016, a Richmond County grand jury indicted Appellant, Elijah Washington, and Shawncy Barrett for malice murder, two counts of felony murder, and possession of a firearm during the commission of a felony. Appellant and Washington were also indicted for possession of a firearm by a convicted felon. Appellant's case was severed for trial, which began on February 6, 2017. On February 8, the jury found him guilty of all charges. The count of possession of a firearm by a convicted felon had been bifurcated, and after the main trial, a brief additional proceeding was held and the jury found Appellant guilty of that charge as well. The trial court then sentenced Appellant as a recidivist to serve life in prison without the possibility of parole for malice murder and consecutive five-year terms for each of the firearm offenses. Although the trial court purported to merge the felony murder counts into the malice murder conviction, those counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 374 (434 SE2d 479) (1993). Appellant filed a timely motion for new trial, which he later amended through new counsel; the trial court denied the

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. Around 5:20 a.m. on February 16, 2016, an employee at a Waffle House restaurant in Augusta called 911 to report that she had seen a man who appeared to be dead from a gunshot wound in the parking lot of the restaurant next door. Responding officers found Baker lying dead with his head and torso on the ground and his feet crossed inside the front, driver-side door of a gray Jeep.

Investigators determined that Baker had been shot once in the back of his head, with the bullet exiting through his forehead and lodging inside the dashboard instrument panel. They also found a .40-caliber shell casing under the mat on the rear, passenger-side floorboard and blood spatter on the gearshift. Based on the location of the body, the bullet, the shell casing, and the blood spatter, investigators determined that Baker was sitting in the driver's seat

motion on December 13, 2018. Appellant then filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2019 and submitted for decision on the briefs. The record does not indicate what happened to Washington's and Barrett's cases; neither of them testified at Appellant's trial.

and the shooter was sitting in the rear, driver-side seat when Baker was shot. Investigators also found $790 cash in Baker's back left pocket. They did not find any weapons on his body or in the Jeep. Surveillance video recordings showed a red Ford Focus hatchback turn toward the Waffle House parking lot around 2:55 a.m., followed by the Jeep around 3:03 a.m.

Later that day, investigators learned from Baker's cell phone records that he received seven phone calls shortly before his death from Elijah Washington's phone number. Investigators went to Washington's apartment to meet him. Washington arrived around 9:00 p.m. driving a red hatchback. Around 8:30 p.m., Appellant, who also lived in the apartment complex and saw the investigators arrive, went to a restaurant where his mother worked and told her that "a boy had got killed" but he was not involved. Appellant's mother contacted an officer to report that Appellant knew something about a shooting and that she had taken him to a nearby motel for his safety. Officers retrieved Appellant from the motel later that night and took him to the sheriff's office.

Appellant was interviewed that night; the interview was video recorded, and the recording was later played for the jury. Appellant told investigators the following story. In the early morning hours of February 16, Appellant's cousin Shawncy Barrett and Washington picked up Appellant at his apartment so they could get something to eat and buy some marijuana. Around 2:30 a.m., Washington drove them toward the Waffle House in the red hatchback. (A fingerprint found on the hatchback's front, passenger-side door was later matched to Appellant.) Washington parked in the lot for the restaurant next to the Waffle House and stayed in the hatchback while Appellant and Barrett went inside the Waffle House. Appellant and Barrett then went outside to the Waffle House parking lot and walked up to a gray Jeep driven by Baker, who recognized Appellant from their time in prison together. Baker asked Appellant if they were planning to rob him, and Appellant said, "Don't know what they got going on." Appellant and Barrett then purchased marijuana from Baker and drove back to Appellant and Washington's apartment complex in Washington's car. When

they arrived, Washington, who was carrying a black and silver .40-caliber handgun, told Appellant, "I got to go handle something," and drove away.

When the investigators told Appellant that they did not believe his story, he modified it. He claimed that after he and Barrett walked up to Baker's Jeep in the Waffle House parking lot, they got into the vehicle, with Appellant sitting in the rear, driver-side seat and Barrett sitting in the front, passenger-side seat. They then instructed Baker to drive to the parking lot next door where Washington was parked to conduct their marijuana transaction there. Baker drove them to the adjacent lot, parked, and retrieved some marijuana from the Jeep's center console. Baker then reached down toward the driver-side door, and Barrett pulled a .40-caliber Highpoint[2] gun out of his jacket and shot Baker while Baker was facing the driver-side door. Barrett took the marijuana and Baker's cell phone and pushed Baker out of the Jeep.

---

[2] The transcript refers to this gun as a "Highpoint" brand. It is likely actually "Hi-Point."

When an investigator told Appellant that the evidence showed that the shooter was sitting behind Baker, Appellant modified his account again. He claimed that Washington gave him a .40-caliber Smith & Wesson handgun before he went into the Waffle House and told him to make sure that nothing happened to Barrett. Appellant said that he then shot Baker when Baker reached down toward the driver-side door because Appellant thought Baker might shoot him or Barrett. After Barrett pushed Baker out of the Jeep and took his cell phone and the marijuana, Appellant, Barrett, and Washington split the marijuana and drove back to the apartment complex. When asked what happened to the Smith & Wesson handgun and Barrett's Highpoint gun, Appellant said that Washington had taken both guns after the shooting.

Two days after the shooting, a maintenance worker found a brown paper bag behind a dumpster next to the rental office at the apartment complex. The bag contained a .40-caliber black and gray Smith & Wesson handgun and a .40-caliber black Highpoint handgun. A firearms examiner later determined that the shell

casing and bullet recovered from Baker's Jeep came from the Smith & Wesson.

At trial, Appellant's sister Kenteria Brown, who was 14 years old at the time of the murder, testified that on the evening before the shooting, Washington came into the apartment she shared with Appellant and their mother, hit the curtains, and said, "I gotta kill somebody tonight." Washington then told Brown, "Go get [your] brother and tell him to bring that fire." (Brown testified that "fire" is slang for a handgun.) Brown went upstairs, told her brother that Washington wanted him, and saw him walk down the stairs with a black and silver handgun.

Appellant, who was a convicted felon, testified at trial, modifying his story yet again. He now claimed that after Baker parked in the lot next to the Waffle House, Washington opened the rear, driver-side door where Appellant was sitting and Appellant scooted over to let Washington get into the car. Washington said to Baker, "Boy, you got that for me," and Baker said, "Yeah." When Baker grabbed the marijuana from the Jeep's center console,

Washington shot Baker with the .40-caliber Smith & Wesson, which Appellant had given him earlier that night, and told Appellant and Barrett, "y'all get that." Appellant said no, but Barrett pushed Baker's body out of the Jeep and took Baker's cell phone and some marijuana. They fled in Washington's car, and Washington threatened to shoot Appellant and Barrett if they did not "shut up."

Appellant further claimed at trial that after Washington dropped Barrett off at his house and gave him some of the marijuana, Washington brandished the Smith & Wesson and said he was going to kill Barrett because he believed that Barrett would tell on him, but Appellant stopped him from shooting Barrett. Washington asked Appellant if he was going to tell, and Appellant said, "No, I ain't gonna say nothing. If anything, I'll admit that I did it." Appellant denied shooting Baker and claimed that he had confessed during his interview because he believed he would be killed if he accused Washington. Appellant's mother also testified that before Appellant confessed during his interview, he told her, "I just gotta do what I gotta do for my family. I'm gonna be killed either

way."

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (defining parties to a crime); *Green v. State*, 304 Ga. 385, 387-388 (818 SE2d 535) (2018) ("It is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." (citation and punctuation omitted)).

2. Appellant argues first that the trial court erred in admitting Brown's testimony about Washington's statements to her on the evening before the shooting. The State principally contended at

trial, and the trial court ruled in its order denying Appellant's motion for new trial, that the statements were admissible under the co-conspirator exception to the hearsay rule. See OCGA § 24-8-801 (d) (2) (E).[3] Appellant asserts, however, that Washington's statements were at most requests to establish a conspiracy, and as such they were not made during the course of or in furtherance of any existing conspiracy. We can assume (without deciding) that the admission of the statements was error, because the evidence was harmless in any event.

"The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Perez v. State*, 303 Ga. 188, 191 (811 SE2d 331) (2018) (citation and punctuation omitted). See also OCGA § 24-1-103 (a)

---

[3] OCGA § 24-8-801 (d) (2) (E) says:
   (2) Admissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is:
                              . . .
   (E) A statement by a coconspirator of a party during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of a conspiracy. A conspiracy need not be charged in order to make a statement admissible under this subparagraph.

("Error shall not be predicated up on a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."). "In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Peoples v. State*, 295 Ga. 44, 55 (757 SE2d 646) (2014) (citations and punctuation omitted).

Washington's first statement to Brown ("I gotta kill somebody tonight") was relevant only to show *Washington's* state of mind, not Appellant's. Brown testified that Appellant was upstairs when Washington made the statement, and there is no evidence that Appellant heard or even knew about the statement prior to the shooting. Indeed, Washington's telling Brown about wanting to kill someone while Appellant was upstairs supported Appellant's theory at trial that Washington unexpectedly killed Baker and that Appellant was merely present in the Jeep.

Washington's second statement, instructing Brown to go get

Appellant and to "tell him to bring that fire," was also minimally harmful to Appellant, because the statement was largely cumulative of other, properly admitted evidence. See *Davis v. State*, 302 Ga. 576, 584 (805 SE2d 859) (2017) (holding that even if a hearsay statement was not admissible under the co-conspirator exception, "its admission into evidence was harmless as it was merely cumulative of other evidence at trial"). Brown testified based on her own observations that Washington came to the apartment on the night of the shooting and that she then saw Appellant carrying a black and silver handgun when he came downstairs to meet and leave with Washington. Moreover, Appellant testified that he gave Washington the .40-caliber Smith & Wesson handgun that was used to shoot Baker and was later recovered from a dumpster at Appellant and Washington's apartment complex two days after the shooting. Washington's statement added only the fact that Washington wanted Appellant to bring the gun, which again only made Washington look more culpable.

Moreover, the properly admitted evidence of Appellant's guilt

was compelling, at least to prove that he was a party to the crimes. See OCGA § 16-2-20 (defining parties to a crime); *Esprit v. State*, 305 Ga. 429, 432 (826 SE2d 7) (2019) ("[A] jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes."). During his interview with the investigators and while testifying at trial, Appellant told several somewhat inconsistent stories about the night of the murder. But in each iteration, Appellant admitted that he rode with Washington and Barrett to the crime scene in Washington's red hatchback, which had Appellant's fingerprint on the front, passenger-side door and which was seen on surveillance video passing by the restaurant just a few minutes before Baker's Jeep.

Appellant also repeatedly admitted that when he and Barrett got into Baker's Jeep to buy marijuana, he sat in the rear, driver-side seat, which is where the crime scene experts and investigators concluded that the shooter was positioned when Baker was shot, based on the forensic evidence. In addition, Appellant admitted at

trial that the murder weapon — the black and gray .40-caliber Smith & Wesson handgun — was his, and Brown saw Appellant carrying a handgun that she described as black and silver when he left the apartment with Washington shortly before the shooting. Appellant also admitted that he got back into Washington's car with Washington and Barrett after Baker was shot, that he fled the scene with them, and in one account that he, Washington, and Barrett split up marijuana they had taken from Baker.

The jury quite reasonably rejected Appellant's claim that Baker was shot in self-defense. No weapon was found on Baker's body or in his Jeep, and the forensic evidence showed that Baker was facing forward when he was shot, not reaching toward and facing the driver-side door as Appellant claimed. Whether Appellant was the shooter (as he admitted in his final story to the investigators) or Barrett or Washington shot Baker using Appellant's gun (as he claimed in other versions), the evidence of Appellant's guilt was compelling.

For these reasons, it is highly probable that any error in

admitting Washington's statements to Brown did not contribute to the guilty verdicts. See *Kirby v. State*, 304 Ga. 472, 487 (819 SE2d 468) (2018) (holding that although evidence was erroneously admitted, the error was harmless because any prejudice it caused "was easily offset by the other compelling evidence against [a]ppellant").

3. About an hour after beginning its deliberations, the jury sent a note to the trial court that asked, "Why wasn't GSR [gunshot residue] done on defendant?" The prosecutor and Appellant's counsel agreed that the court should respond, "You must decide the case on the evidence presented to you during the trial," and the court did so. The court then took a recess. The trial transcript does not state explicitly whether Appellant was present in the courtroom for this brief discussion. The transcript shows that a few minutes later the court went back on the record and, after stating that Appellant was present with his lawyer, marked the jury's note as an exhibit for the record.

Appellant now contends that the initial discussion of the jury's

note during his alleged absence from the courtroom violated his constitutional "'right to be present, and see and hear, all the proceedings which (we)re had against him on trial before the (c)ourt.'" *Heywood v. State*, 292 Ga. 771, 773 (743 SE2d 12) (2013) (citation omitted). We need not decide whether Appellant actually was present for the initial discussion of the jury's note, because he had no right to be present for that discussion.

A defendant's right to be present attaches "'at any stage of a criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure.'" *Leeks v. State*, 296 Ga. 515, 519 (769 SE2d 296) (2015) (citation omitted). But the right "does not extend to situations where the defendant's presence would be useless, or the benefit but a shadow." *Heywood*, 292 Ga. at 774 (citation and punctuation omitted). Thus, our precedent makes clear that a defendant who is represented by counsel need not be present for portions of a trial that "involve questions of law and consist of essentially legal argument about which the defendant presumably has no knowledge." Id. (citation

and punctuation omitted). So such a defendant's right to be present is not violated by his involuntary absence from the court's charge conference with counsel, see *Huff v. State*, 274 Ga. 110, 111-112 (549 SE2d 370) (2001), or "'from [a] conference held by a trial court with defense and prosecuting counsel to discuss a response to a deliberating jury's substantive inquiry.'" *Leeks*, 296 Ga. at 519 (citation omitted). Compare *Burney v. State*, 299 Ga. 813, 819 (792 SE2d 354) (2016) (explaining that jury notes concerning the *composition* of the jury are within the scope of the defendant's right to be present and thus are required to be discussed with the defendant present or made available to him).

In this case, the initial discussion of the jury note presented a purely legal issue regarding how the trial court should respond to the jury's substantive inquiry about why certain evidence was not presented. The jury's question called solely for legal argument from the prosecutor and defense counsel, who were both present and in agreement that the court should simply refer the jurors to the evidence presented at trial. Thus, even assuming that Appellant was

absent during the discussion, his right to be present was not violated. See, e.g., *Leeks*, 296 Ga. at 519 (holding that the defendant's right to be present was not violated when the trial court, with defense counsel present, answered a jury question by referring the jury to previous instructions, because the defendant "could [not] have made a meaningful contribution to the manner in which [the court] formulated [its] response"); *Johnson v. State*, 293 Ga. 641, 644 (748 SE2d 896) (2013) (holding that the defendant's right to be present was not violated when the trial court and counsel discussed a jury note in his absence and the court referred the jury to already-issued instructions, because "the discussion pertained to legal matters about which [he] could not have made a meaningful contribution").

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 4, 2020.

Murder. Richmond Superior Court. Before Judge Flythe.

*Crawford & Boyle, Eric C. Crawford*, for appellant.

*Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.