309 Ga. 76
FINAL COPY

S20A0064. HEARD v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Damien Heard was convicted as a party to malice murder and other crimes in connection with the fatal shooting of James Daniel Evers ("Daniel"), the armed robbery of Donald Evers ("Donald"), and the aggravated assaults of Charles Emmons and John Elledge, Jr. In this appeal, Appellant argues, among other things, that the trial court erred by admitting under OCGA § 24-4-404 (b) evidence of subsequent crimes committed by Appellant. As explained below, because the trial court abused its discretion by admitting the evidence of Appellant's later crimes and the error was not harmless, we reverse Appellant's convictions.[1]

---

[1] The charged crimes occurred on April 4, 2013. On October 26, 2016, a Clayton County grand jury indicted Appellant, Lajuante Stephens, Jamarcus Woodall, and Alfred Smith for malice murder, felony murder based on aggravated assault, false imprisonment, armed robbery of Donald, four counts of aggravated assault with a deadly weapon (one for each victim), aggravated assault with intent to rob Donald, and four counts of possession of a firearm during the commission of a crime. The co-indictees' cases were severed for trial, and Appellant was tried from December 4 to 7, 2017. The jury found him guilty

1. The evidence presented at Appellant's trial showed the following.[2] On the morning of April 4, 2013, Donald was in a trailer in the back yard of the house on Rock Cut Road in the Conley area of Clayton County where he lived with his son, Daniel. Some time after 9:30 a.m., a young man walked into the trailer behind Donald and put a gun to the back of his head, telling him to get on his knees and look down. Donald did not know the gunman, but described him

of all charges.

The trial court sentenced Appellant to serve life in prison without the possibility of parole for malice murder; life in prison with the possibility of parole for armed robbery; 10 years for false imprisonment; 20 years each for aggravated assault with a deadly weapon against Donald, Emmons, and Elledge; and five years for each firearm count, with all of the sentences to be served consecutively. The trial court merged the remaining counts for sentencing. Appellant filed a timely motion for new trial, which he amended with new counsel on May 22, 2018. On June 11, 2018, the trial court modified Appellant's sentence to vacate rather than merge the felony murder and to merge the aggravated assault with a deadly weapon against Donald into the armed robbery conviction. After an evidentiary hearing, the trial court denied Appellant's motion for new trial on October 17, 2018. Appellant then filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2019 and submitted for decision on the briefs.

The record in this case does not indicate what happened to the cases of Appellant's co-indictees, but the District Attorney represents in his brief that Woodall and Smith pled guilty to reduced charges. Stephens was convicted of malice murder and related crimes in a separate trial; his appeal of those convictions is pending in this Court as Case No. S20A0583.

[2] Because this case requires a close assessment of whether an error by the trial court was harmless, we lay out the evidence in considerable detail and not only in the light most favorable to the jury's verdicts. See *Ensslin v. State*, 308 Ga. 462, 462 n.2 (841 SE2d 676) (2020).

as young and having his hair in twists in a "checkerboard" pattern. Another young man, whom Donald never saw clearly, walked beside Donald and began rummaging through drawers in the trailer. The man also took Donald's cell phone and wallet from his pockets. The man with the gun asked Donald how many people were in the house, which doors were unlocked, and where the money and marijuana were. Donald said that he did not know anything.

The gunman then ordered Donald to walk outside and get on the ground. The other man used clear packing tape to bind Donald's hands and cover his eyes. The men then knocked Donald down and put the hood of a pickup truck over him. Through a sliver between the hood and ground, Donald saw the gunman walk away, speaking on a cell phone, and heard him say, "we got one of them behind the building duct taped." The gunman told the other man to watch the "side and front." Both men then walked out of Donald's sight. About 25 minutes later, Donald heard four or five gunshots that sounded close to him. He then heard two people run toward him and jump over a nearby fence. When he thought it was safe, Donald came out

from under the hood.

Meanwhile, Daniel, who had returned with his girlfriend Ashley Baxley from a trip to Florida the night before, was working near the house on the long driveway that led to the house with Baxley and his friend Charles Emmons. They had detached Daniel's motorcycle trailer from his Yukon SUV and were driving from the house toward the street when Daniel noticed an unfamiliar green Mountaineer SUV parked nearby and asked Emmons who drove it; Emmons said that he did not know. Daniel also saw tracks in his yard from a four-wheeler and was upset about them. He stopped the Yukon so he could find and say something to the person who caused the tracks. He walked along the driveway back toward the house, with Emmons following some distance behind him. He got to a point in the driveway where Baxley and Emmons could not see him. When they heard a gunshot, Emmons ran toward where Daniel had been; when Emmons got near the house, a dark-skinned man with hair twists fired three shots at him. Emmons ran back to the Yukon, and he and Baxley drove away. The green Mountaineer followed them.

Around this time, Baxley's friend Christy Oliver and Oliver's friend John Elledge, Jr., arrived at the store across the road from the Everses' house. Oliver noticed a green SUV parked near the house in a place where no one usually parked. She also saw Appellant, whom she knew, "walking along the grassline" on the side of the store, talking on a cell phone.[3] Then Elledge and Oliver heard three or four gunshots and saw three men, one with hair twists, jump over a fence and head toward the green SUV. The three men looked "very young" to Oliver; they did not include Appellant.

---

[3] On direct examination at trial, Oliver acknowledged that she did not mention seeing Appellant in her first interview with the lead investigator on the case, Detective John Gosart. On cross-examination, she admitted that the interview was a few hours after the shooting, whereas the first time she mentioned Appellant was in a pretrial interview three years later in September 2016. (Detective Gosart testified that he interviewed Oliver "multiple times" after the incident, but she did not mention Appellant until 2016.) Oliver testified that she knew Appellant only as "D," and she knew another person as "D" as well. There was then some confusion in her testimony about whether the "D" she saw by the store was Appellant or the "other D." She finally settled on again saying that Appellant was the "D" she saw by the store.

When Appellant's counsel began questioning Oliver on cross-examination, he asked if she was under the influence of something. When she responded no, counsel said that he was asking because her eyes looked "glassy." She said it was because she had been crying all day. The State objected to counsel's comment on Oliver's appearance, and the trial court sustained the objection and instructed the jury to "ignore any comments made by the attorneys." Trial counsel testified at the motion for new trial hearing that Oliver appeared to be "under the influence" when she was testifying.

Elledge got into his truck and followed the men, trying to see the license plate number on the green SUV.

Baxley and Emmons had driven in the Yukon to the house of Daniel's grandmother, which was less than a mile away, near the corner of Slate Road and Falcon Court. As Emmons pulled up to the house, he saw the green Mountaineer pass with a young man – not the one who had shot at him – hanging out of the window with a pistol in his hand. Emmons jumped out of the Yukon and started running. Baxley got on the floor of the Yukon. Meanwhile, in his truck, Elledge continued to follow the Mountaineer as it turned from Slate Road onto Falcon Court, which was a dead-end. The Mountaineer turned around and drove back toward Elledge's truck, and one of the passengers shot at Elledge as the Mountaineer drove away.

Baxley heard several gunshots and heard the Mountaineer drive off. She then got in the driver's seat and drove the Yukon back to the Everses' house. She saw Oliver running up and down the driveway and drove to the part of the driveway near the house,

where she found Daniel, who had died from a gunshot wound to the head. Elledge also returned to the Everses' house, where he saw Donald and helped him remove the tape from his wrists.

The police received 911 calls reporting shots fired at 2:54 and 2:58 p.m. and arrived at the Everses' house about 15 minutes later. Four .380 shell casings were in the driveway, with one about six inches from Daniel's body. The bullet later removed from his skull was also a .380. All four shell casings and the bullet were fired from the same gun, which was matched to an incident on April 2, two days before the murder. In that incident, Jamari Worthy shot himself in the foot while playing with the gun, which Jamarcus Woodall had brought to the Four Seasons Apartments in Atlanta.[4] Woodall came with Lajuante Stephens, who lived in the apartments, and Alfred Smith. After Worthy shot himself, Woodall, Stephens, and Smith fled; Stephens took the gun. Worthy was arrested for a probation violation and was in jail at the time of the murder. He testified that

---

[4] Detective Gosart testified that the Four Seasons Apartments are five to seven miles from the Everses' house.

he did not personally know Appellant, but "a lot of people say in the streets" that Appellant is called "Mastermind."

The green Mountaineer, which had been stolen from the Four Seasons Apartments on the day before the murder, was found burned on the day after the murder less than a mile from the apartments. At the time of the shooting, Stephens, Smith, and Woodall were 17 or 18 years old. Detective Gosart, the lead investigator, testified that he identified Stephens as a suspect based in part on his age and on the description he got "[p]er [his] investigation" of Stephens's hair, which was short dreads pulled out in a "baseball diamond" pattern.[5] No evidence was presented that any victim or other eyewitness to the crimes identified Stephens, Smith, or Woodall as perpetrators, before or during Appellant's trial.

According to cell phone records, on the day of the crimes, Appellant's and Stephens's phones exchanged 28 calls between 12:02 p.m. and 11:34 p.m. In the period shortly before the murder,

---

[5] Detective Gosart did not see a photograph of Stephens until about a month and a half after the crimes. By that time, Stephens had a different hairstyle.

between 1:57 p.m. and 2:32 p.m., Stephens's phone called Appellant's phone eight times, and Appellant's phone called Stephens's phone twice. During these calls, Stephens's phone was pinging on a tower seven-tenths of a mile from the Everses' house. At 2:41 p.m., Appellant's phone began pinging on a tower south of the house and ended pinging on a tower closer to the house. An expert in interpreting cell phone records testified that a call may move between towers because the phone is moving or because the tower becomes too busy. Appellant's phone then pinged on towers near the Everses' house for several calls. At 3:00 p.m., Stephens's phone called Appellant's phone and began moving toward the Four Seasons Apartments. Appellant's phone called Stephens's phone at 3:01 and at 3:38 p.m. At 3:38 and for several calls until 3:53 p.m., Appellant's phone pinged on a tower near the Four Seasons Apartments. The State did not elicit any evidence that Appellant called Stephens before or after the day of the crimes or that he ever called Smith or Woodall. While Appellant was in jail awaiting trial, he made a call using Smith's phone card, in which he said,

"everybody staying solid and s\*\*t" or "everybody staying silent and s\*\*t."[6]

About a year after the murder, Appellant's former cellmate, Cedrick Newton, told Detective Gosart that Appellant had told him the following about the crimes.[7] Three younger men asked Appellant if he knew someone to rob. Appellant replied that he knew that Daniel had a large amount of money because he had seen it. Appellant met the three men at his home, and they drove to Daniel's house in a Mountaineer that they had stolen from the Four Seasons Apartments. The younger men went to the garage at the back of the house and tied up Daniel's father. They then encountered and shot

---

[6] Appellant testified that he said "staying solid." The prosecutor argued that Appellant said "staying silent." The recording was played for the jury; it is not clear enough to determine whether Appellant said "silent" or "solid."

[7] When Newton asked to speak with Detective Gosart about Appellant, Newton was serving a prison sentence for a drug crime. By the time Newton testified at Appellant's trial, Newton had completed his prison sentence. At trial, Newton refused to repeat what he had told the detective. He testified that he could not remember anything that was said. The State then played the recording of Newton's statement. While giving the statement, Newton frequently asked the detective for help, and the detective promised to speak to Newton's attorney. After the recording was played, the prosecutor highlighted a few comments from the recording, and Newton acknowledged that the recording reflected that he had said them.

Daniel. Appellant called the young men repeatedly to see why the robbery was taking so long. After it was over, the young men went back to the Four Seasons Apartments. Someone followed them when they left the scene, so they shot at him. Because they did not get any money from the attempted robbery, they called Appellant. He "went and met them" and gave each man $20 and some marijuana. Appellant and the men later burned the Mountaineer.[8]

One of Daniel's friends testified that Daniel sometimes sold narcotics and had large amounts of cash. The night before Daniel left for Florida, he had between $17,000 and $18,000 in cash sitting out at his house when Appellant came over, although Daniel and his friend tried unsuccessfully to cover it before Appellant walked in. During the visit, Daniel's friend heard Daniel raise his voice at Appellant. Baxley, who knew Appellant, also testified that

---

[8] Newton did not say directly in his recorded statement where Appellant met the younger men after the crimes, but after the recording was played at trial, the prosecutor asked Newton if "the tape said that [Appellant] also traveled up to the Four Seasons," and Newton answered, "yes." Throughout his recorded account of the crimes, Newton alternates between calling the murder victim "Daniel" and "David."

Appellant came to Daniel's house shortly before they left for Florida. Donald testified that when Daniel left for his trip, he gave Donald $9,000 in cash to hold, but Daniel changed his mind and returned about 30 minutes later to retrieve the money.

Appellant testified at trial. He claimed that he had a good relationship with Daniel but had not seen him recently before the murder. Appellant did not dispute the cell phone records. He explained that he was in his apartment off Rock Cut Road, which was in the same general area as the Everses' house, for most of the day, and he had his cell phone with him throughout the day. At some point, he got a call from a woman calling from the number associated with Stephens's phone; she wanted to buy drugs. She first came to Appellant's apartment; she called him several times to get directions there and then for instructions on how to get out of his apartment complex. She later called to ask for more drugs, prompting Appellant to take drugs to her apartment at the Four Seasons Apartments

several times that day.[9]

Appellant testified that he believed that Newton went through Appellant's discovery packet, which Appellant had in their cell, to get details of the crimes. On cross-examination, the prosecutor asked Appellant, "[Y]ou heard Cedrick Newton testify that you went up to the Four Seasons?" Appellant answered, "I did. I heard him say that." The prosecutor then asked, "[Newton] was clairvoyant enough to know that you went up to the Four Seasons, even though that wasn't in the discovery?" Appellant answered, "Unfortunately, yes." Appellant said that he did not know Stephens, Woodall, or

---

[9] Phone records showing text messages exchanged between Appellant's phone number and a woman identifying herself as "Dixie" (who was not using the number associated with Stephens's phone) were admitted into evidence at trial. There was no testimony or argument about these text messages at trial, but the District Attorney now highlights them and asserts that they show that Appellant's story was false. Specifically, at 2:01 p.m. on the day of the murder, Dixie sent a message that said, "U still got some of them perc." Appellant quickly replied, "Yes." At 2:04, Dixie texted, "U at apt? can u do 7 for 20.00?" Receiving no response, three minutes later, Dixie texted, "Can I come by," and two minutes after that, she texted, "I jus found a 1.00 in the truck so i got 21. Was up?" At 2:14, she texted, "I'm right down the road so let me know somethin while I'm here." Appellant still did not reply, and at 2:20, Dixie texted, "I woulda done the 14 for 40.00 too but damn u won't even answer me." At 4:27 p.m., she texted, "If u don't have them jus tell me now so I don't keep waitin." Appellant then replied at 4:28, "I do im just not around."

Smith before they were arrested, but he acknowledged that he became friendly with them in jail.

2. Appellant argues that the evidence presented at his trial was legally insufficient to support his convictions. In evaluating this claim, we view the evidence in the light most favorable to the verdicts, leaving the resolution of "'questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence . . . to the discretion of the trier of fact.'" *Mims v. State*, 304 Ga. 851, 853 (823 SE2d 325) (2019) (citation omitted). Although there is no evidence that Appellant directly committed any of the crimes, OCGA § 16-2-20 (a) says that anyone "concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime[,]" and OCGA § 16-2-20 (b) explains that a person is "concerned in the commission of a crime" if he, among other things, "[i]ntentionally aids or abets" the commission of the crime or "[i]ntentionally advises, encourages, hires, counsels, or procures" another person to commit the crime. "'[The] jury may infer [the] common criminal intent [needed to make one a party] from the

defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes.'" *Carter v. State*, ___ Ga. ___, ___ (842 SE2d 831) (2020) (citation omitted).

In his recorded statement, Newton said that Appellant admitted that he identified Daniel as a robbery target for three younger men because he had seen Daniel with a large amount of money, he rode to Daniel's house with them in the stolen Mountaineer, he called them during the robbery, he met with them after they fled, and he later burned the Mountaineer with them. Newton's account was supported by the cell phone records showing Appellant's locations and communications with Stephens's phone, Oliver's testimony about seeing Appellant at the store near the Everses' house around the time of the murder, the testimony of Daniel's friend that Appellant knew Daniel had a large amount of cash shortly before the crimes, and the evidence of what happened after the murder. Appellant's testimony that he had not seen Daniel recently before the murder was contradicted by Daniel's friend and by Baxley; Appellant's account of his activities on the day of the

crimes was consistent with the cell phone records but was otherwise uncorroborated.

The overall evidence of Appellant's participation as a party to the crimes was not strong, in part because the evidence of who directly committed the crimes was thin. When viewed in the light most favorable to the verdicts, however, the evidence was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).[10]

3. Before voir dire began on the first day of trial, the State asked the trial court to rule on the admissibility under OCGA § 24-4-404 (b) ("Rule 404 (b)") of evidence that about two months after the charged crimes, Appellant committed a carjacking, drove the stolen

---

[10] Even though we are reversing Appellant's convictions, we have addressed his claim that the evidence was not legally sufficient to support the convictions, because this issue affects the State's ability to retry him. See *Sheard v. State*, 300 Ga. 117, 121 n.5 (793 SE2d 386) (2016). Because the evidence was legally sufficient to sustain his convictions, the State may choose to retry Appellant. See id. We need not address Appellant's three other enumerations of error, however, because they are unlikely to occur again if the State elects to retry him. See id.

car to Gwinnett County and stole a woman's purse, and then set the car on fire and abandoned it a little over a mile away from the Four Seasons Apartments. The State asserted that these later crimes showed Appellant's preparation and plan, absence of mistake or accident, identity, intent, and opportunity with respect to the charged crimes.[11] Appellant objected, arguing among other things that the otheracts evidence was not relevant proof for any of the purposes the State proposed, but the trial court ruled that the evidence was admissible. The court did not specify the admissible purposes for the evidence during the Rule 404 (b) conference, but when the evidence was admitted at trial, the court instructed the jury:

> [I]n order to prove its case the State must show intent, plan, identity of the perpetrator and motive. To do so the State is offering evidence of other crimes allegedly

---

[11] Specifically, the prosecutor argued that the later crimes showed "the preparation and the plan as to how they are going to effectuate these crimes by use of a stolen vehicle and then damaging, burning that stolen vehicle"; showed absence of mistake or accident because "[t]he evidence is that the defendant is deliberately stealing these vehicles and subsequently setting them on fire to get rid of any evidence that happened in both cases"; showed that the "identity of the crimes" was similar; and showed "the defendant's intent to permanently deprive both of the owners of the vehicles." The prosecutor did not offer any argument about opportunity.

committed by the accused. You are permitted to consider the evidence only insofar as it may relate to those issues and not to any other purpose.

This instruction was given twice during the trial as the other acts evidence was presented and again as part of the final jury charge.

Appellant argues that the trial court erred in admitting the evidence of Appellant's later crimes under Rule 404 (b). We agree, and because this error was not harmless, we reverse Appellant's convictions.

(a) *The Evidence Admitted Under Rule 404 (b).*

During the trial, Ashleigh Brown testified that on June 17, 2013, which was two-and-a-half months after the crimes charged in this case, she briefly left her four-door Acura sedan running in the Conley area while she took her youngest child into his grandmother's house. Her other two children, who were nine years old and four or five years old at the time, remained in the car. While Brown was in the house, Appellant jumped into the car. The younger child, who was in fourth grade at the time of trial, testified that Appellant, whom she identified in a photographic lineup after the

incident, shoved her older brother out of the car, drove a short distance with her scared and crying in the backseat, and then pulled over and left her in a yard, where someone saw her and called 911. Detective Gosart, who also investigated these crimes, testified that the stolen car was found, burned, at 4:00 the next morning 1.3 miles from the Four Seasons Apartments in Atlanta.

As noted above, when Appellant's former cellmate Cedrick Newton testified that he could not remember anything he had previously told Detective Gosart, his recorded statement was played for the jury. In that statement, Newton told the detective that Appellant said that he stole a car with a child in it, drove the car to the Four Seasons Apartments, where he met a friend, and then drove the car to Gwinnett County and stole a woman's purse, after which they returned to the Four Seasons Apartments and set the car on fire.

When Appellant testified, he denied committing the later crimes and pointed out that he had not been convicted for them, arguing that the lack of convictions showed his innocence. The

prosecutor replied, "That case is still pending," and "We're trying the murder first, right?" Appellant did not answer that question.

(b) *Rule 404 (b).*

Under OCGA § 24-4-404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith[,]" but such other acts evidence is admissible for other purposes, including to prove motive, intent, plan, and identity. The party offering evidence under Rule 404 (b) must show three things: (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act. See *Kirby v. State*, 304 Ga. 472, 481 (819 SE2d 468) (2018).

To determine whether, under the first part of this test, the evidence offered is relevant to a particular non-character purpose, we look to OCGA § 24-4-401, which defines "relevant evidence" as

evidence that "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This is a binary question – evidence is either relevant or it is not. See *Olds v. State*, 299 Ga. 65, 69-70 (786 SE2d 633) (2016).

The second part of the test is governed by OCGA § 24-4-403, which says:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Because the evidence statutes pertinent to this analysis are parts of Georgia's current Evidence Code that materially track their counterparts in the Federal Rules of Evidence, we look to the decisions of the federal appellate courts for guidance in applying the provisions. See *Kirby*, 304 Ga. at 480 n.5. We review the trial court's ruling admitting evidence under Rule 404 (b) for abuse of discretion.

See id. at 479.[12] And we conclude that the trial court abused its discretion in ruling that the evidence of Appellant's later crimes was relevant for any of the four purposes for which it was admitted – to show Appellant's motive, intent, plan, and identity with regard to the crimes charged in this case.

(c) *Motive*.

To properly show motive, "the extrinsic evidence must be logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged." *Kirby*, 304 Ga. at 486-487 (citation and punctuation omitted). Although the trial court instructed the jury that the other acts evidence could be considered to show Appellant's motive, the State never argued at trial that the evidence should be admitted for that purpose, and even

---

[12] The Attorney General mistakenly argues that our review should be limited to plain error because Appellant objected to the admissibility of the other acts evidence only at the Rule 404 (b) conference and not again when the evidence was admitted during the trial. But "[o]nce the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal." OCGA § 24-1-103 (a). See also *Anthony v. State*, 298 Ga. 827, 831-832 (785 SE2d 277) (2016) (applying this rule to a pretrial ruling on the admissibility of evidence under Rule 404 (b)).

on appeal, the State makes no argument that the later crimes show Appellant's motive in committing any of the charged crimes. We see no legally proper argument that the later crimes were relevant to Appellant's motive for the charged crimes. See id. at 487 (rejecting motive arguments cast in "far too generic a fashion" such as an "inclination to use violence to obtain money" (punctuation omitted)). Accordingly, the trial court abused its discretion by admitting evidence of Appellant's later acts to show motive. See id.; *Thompson v. State*, 302 Ga. 533, 540 (807 SE2d 899) (2017); *Brooks v. State*, 298 Ga. 722, 726-727 (783 SE2d 895) (2016).

(d) *Intent.*

"[T]he relevance of other acts evidence offered to show intent is established when the [other] act was committed with the same state of mind as *the charged crime.*" *Naples v. State*, 308 Ga. 43, 51 (838 SE2d 780) (2020) (emphasis added). See also *Jackson v. State*, 306 Ga. 69, 77 (829 SE2d 142) (2019) ("Because the 2005 shooting and the aggravated assault (and resulting felony murder) *charged in this case* involved an assault with a deadly weapon, the 2005 shooting

evidence was relevant to show intent." (emphasis added)); *Kirby*, 304 Ga. at 482-483, 485 (focusing on whether the intent elements that the State had to prove for the charged crimes were the same as the intent involved in the other acts).

At the Rule 404 (b) conference, the State argued that Appellant's later criminal acts were relevant to show his "intent to permanently deprive both of the owners of the vehicles." On appeal, the State similarly argues that the evidence of the later crimes showed Appellant's "intent to participate in the acts of obtaining stolen vehicles before committing theft-related crimes" and his intent to "dispose of the vehicle permanently thereafter."[13]

But the State did not *charge* Appellant with any crimes related to the theft or disposal of the Mountaineer.[14] Whatever intent Appellant may have had with regard to stealing or disposing of the Mountaineer was not a fact that the State had to establish to prove

---

[13] Although the closing arguments were not transcribed, the State does not assert that it made any different intent argument to the jury.

[14] During the Rule 404 (b) conference, the prosecutor was apparently under the misimpression that Appellant had been indicted as a party to the theft of the Mountaineer.

Appellant's guilt in this case and thus was not a fact "of consequence to the determination of the action[.]" OCGA § 24-4-401. Accordingly, the trial court also abused its discretion by admitting the other acts evidence to show intent.[15]

(e) *Plan.*

Evidence admitted under Rule 404 (b) to show the defendant's plan or preparation often "show[s] the planning of or preparation for the charged offense." *United States v. LeCompte*, 99 F3d 274, 277 (8th Cir. 1996). See also *United States v. Dothard*, 666 F2d 498, 502 (11th Cir. 1982) ("Courts have admitted extrinsic act evidence to show a defendant's design or plan to commit *the specific crime charged*, but never to show a design or plan to commit '*crimes of the*

---

[15] The intent involved in some of the charged crimes may be the same as the intent Appellant had in committing the later acts, but the State has never argued that the otheracts evidence was relevant to prove any such intent. We have no obligation to make that argument for the State on appeal, much less to determine whether it would have merit, particularly under the second, probative-value-versus-prejudice part of the Rule 404 (b) test. Cf. *Jackson*, 306 Ga. at 77 n.8 ("Because the State offered the evidence of the 2005 shooting and defends it on appeal only as showing Appellant's intent in committing an aggravated assault by shooting at Wallace, we do not consider whether the [other act] evidence was relevant or probative to proving any of the other crimes with which Appellant was charged.").

*sort* with which he is charged.' . . . Thus, proof of design or plan by showing the commission of similar acts requires more than 'merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" (citations and punctuation omitted; emphasis added)); *United States v. O'Connor*, 580 F2d 38, 41 (2d Cir. 1978) (explaining that other act evidence may be proof of preparation or plan if it demonstrates "a connected or inseparable transaction" or "a continuing scheme or conspiracy"). There was no evidence that Appellant's later acts were part of his plan in robbing Daniel.[16]

---

[16] This type of "plan" evidence may overlap with "intrinsic evidence" – evidence that is "necessary to complete the story of the crime" or "inextricably intertwined with the evidence regarding the charged offense" – to which the limitations and prohibitions of Rule 404 (b) do not apply. *Williams v. State*, 302 Ga. 474, 485 (807 SE2d 350) (2017) (citations and punctuation omitted). On appeal, the District Attorney argues for the first time that the later car theft "arose out of the series of transactions related to the murder and armed robbery," because it was "integral to explaining how the murder was committed and how the perpetrators were identified and how they were connected to each other." But there was no evidence whatsoever that the later crimes were used to link any of the co-indictees together or that any of Appellant's co-indictees were involved. The argument that the later-crimes evidence was intrinsic evidence is untenable.

"In other cases, evidence of related or similar prior offenses has been admitted because it tended to prove that [the] defendant employed a 'common scheme' to commit a series of similar crimes." *LeCompte*, 99 F3d at 278. This approach blends the purpose of *plan* with the purpose of *identity* – showing that a distinctive plan was used tends to prove that the same person executed both plans. See id.; *O'Connor*, 580 F2d at 42 (explaining that the government's argument that the other act evidence showed "a unique pattern or plan" was introduced "to establish [the defendant's] identity"). Because this distinctive-plan purpose involves the same considerations as the State's argument that the other acts evidence showed identity, it succeeds or fails with that argument, which we consider next.

(f) *Identity*.

We have explained that the admission of other acts evidence to prove identity "'must satisfy a particularly stringent analysis.'" *Brooks*, 298 Ga. at 725 (citation and punctuation omitted).

When extrinsic offense evidence is introduced to prove

identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused. . . . The extrinsic act must be a "signature" crime, and the defendant must have used a modus operandi that is uniquely his.

Id. (citation and punctuation omitted).

Of course, it is not necessary that the charged crime and the other crimes be identical in every detail. But they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person. The more unique each of the common features is, the smaller the number that is required for the probative value of the evidence to be significant. But a number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together.

*United States v. Grimmette*, 208 Fed. Appx. 709, 711 (11th Cir. 2006) (punctuation omitted) (quoting *United States v. Myers*, 550 F2d 1036, 1045 (5th Cir. 1977)).

As the prosecutor argued at the Rule 404 (b) conference, both the charged crimes and Appellant's later crimes involved (1) the "use of a stolen vehicle" that (2) was later abandoned and burned. Those two features of the charged and uncharged crimes may not be

commonplace, but they are not especially distinctive. Just in the murder cases that this Court decides, for example, earlier this year we had a case involving a vehicle that had been stolen and used in one armed robbery that led to a shooting and another that resulted in a murder before being abandoned and set on fire. See *Wells v. State*, 307 Ga 773, 774-775 (838 SE2d 242) (2020). See also *Walker v. State*, 310 Ga. App. 223, 223-224 (713 SE2d 413) (2011) (involving a stolen car that was used to commit armed robberies and other crimes and then abandoned and set on fire).[17]

We also note that the Mountaineer involved in the charged crimes and the Acura involved in the later crimes were stolen in the same general vicinity and then abandoned in somewhat closer

---

[17] Additionally, in 2018, this Court decided three cases in which the defendants burned and abandoned the vehicles they used to commit the charged crimes. See *State v. Atkins*, 304 Ga. 413, 414 (819 SE2d 28) (2018); *Stripling v. State*, 304 Ga. 131, 133 (816 SE2d 663) (2018); *Kemp v. State*, 303 Ga. 385, 387 (810 SE2d 515) (2018). And we recently decided several more cases in which the defendants used stolen vehicles to commit crimes. See, e.g., *Grissom v. State*, 296 Ga. 406, 408 (768 SE2d 494) (2015); *Lewis v. State*, 294 Ga. 526, 526-527 (755 SE2d 156) (2014) (defendant stole a vehicle and then abandoned it after committing the charged crime). There is no allegation, of course, that any of these cases involved signature crimes committed by Appellant.

locations.[18] Similar locations can be pertinent to the identity analysis, but when the locations are not identical, the location feature must be combined with a greater number of more unusual similarities to indicate a signature crime.[19] And although the charged and uncharged crimes were not very far apart in time (two-and-a-half months), they were not connected as part of an ongoing

---

[18] The Mountaineer was stolen at the Four Seasons Apartments in Atlanta, which Detective Gosart testified are about five to seven miles from the Everses' house in the Conley area in Clayton County, and the Acura was stolen from a house somewhere else in the Conley area. There was testimony that the vehicles were abandoned on different streets close to the Four Seasons Apartments, with the Mountaineer left less than a mile away and the Acura left 1.3 miles away, but there was no evidence about the distance between those two locations.

[19] See, e.g., *United States v. Stenger*, 605 F3d 492, 499-500 (8th Cir. 2010) (holding that the two charged and two uncharged bank robberies were "'sufficiently idiosyncratic'" when, in addition to the banks' being "all within relatively easy driving distance of one another," the robberies all occurred within two months of each other, "targeted the same type of financial institutions," and "involved a tall Caucasian male conducting a takeover-style robbery, wearing a mask and hooded sweatshirt, and carrying a black powder pistol," the use of which was "especially unusual" in a robbery); *United States v. Clemons*, 32 F3d 1504, 1509 (11th Cir. 1994) (holding that evidence of prior carjackings was admissible to show identity as to the later charged carjacking where not only were the stolen cars taken from a similar location, but also the crimes were all committed in the same manner, the cars taken were a similar type, and the cars were repaired before being disposed of); *United States v. Sanchez*, 988 F2d 1384, 1394 (5th Cir. 1993) ("[T]he location of both [drug] transactions – 4906 Buena Vista – combined with the presence of the apparent owner of the primer grey Volkswagen which had the same license plate number is of signature quality.").

crime spree. See *United States v. Lail*, 846 F2d 1299, 1301 (11th Cir. 1988) (explaining that where two charged bank robberies occurred on November 18 and 27 and an uncharged bank robbery occurred on December 20, the proximity in time "alone does not have great significance" without "information concerning the rate at which bank robberies occur in the relevant portions of Florida").

The similar (but not unique) features of the charged and uncharged crimes in this case are undermined by the major differences between them. See Lail, supra (holding that the "major dissimilarities" between the charged and uncharged bank robberies were "more striking" than the four similarities between them, none of which could be called a "signature" trait). Compare *McKinney v. State*, 307 Ga. 129, 136-137 (834 SE2d 741) (2019) (holding that the other act evidence was admissible to prove identity because there were "several significant similarities" with the charged crimes, including in particular that both victims were the appellant's former girlfriends, and no "major dissimilarities"). There was no reason to believe that the person who alone directly stole an Acura sedan from

a woman, assaulted one of her children, and kidnapped her other child in front of a house in Conley was the same person who by entirely unknown means, and possibly working with other persons, stole a Mountaineer SUV from an apartment complex miles away in Atlanta more than two months earlier. Nor were the stolen vehicles used for anything like the same crimes. Not a single detail of Appellant's driving to Gwinnett County with an unidentified friend and stealing a purse in an unidentified manner from a woman there matches the crimes committed with the Mountaineer, in which Appellant and three other men drove the SUV to a house a few miles away in Conley to commit an armed robbery of an alleged drug dealer, with Appellant directing his associates from a location nearby as they snuck into the trailer behind that house, detained one man there, and then shot the alleged drug dealer in the driveway before fleeing without Appellant.

Because the State did not establish that the features of the charged crimes and the later crimes, viewed individually or as a whole, marked those crimes as the unique "signature" of the same

perpetrator, the trial court abused its discretion by admitting evidence of those other acts to show a distinctive plan and identity. See *Brooks*, 298 Ga. at 726; *Lail*, 846 F2d at 1301.

(g) *Harm*.

Based on the discussion above, we conclude that the State failed to show a relevant purpose for the other acts evidence; the trial court therefore abused its discretion by admitting that evidence under Rule 404 (b). The trial court's evidentiary error requires reversal of Appellant's convictions unless it can be deemed harmless, meaning that "'it is highly probable that the error did not contribute to the verdict.'" *Brown v. State*, 303 Ga. 158, 164 (810 SE2d 145) (2018) (citation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."). "'In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict.'" *Thompson*, 302 Ga.

at 542 (citation omitted). In this case, although it is a close question, we conclude that the trial court's error was not harmless.

We have held that evidence that was (or was assumed to have been) improperly admitted under Rule 404 (b) was harmless in cases where the properly admitted evidence proving that the appellant committed the charged crimes was so strong that the prejudicial effect of the other acts evidence had no significant influence on the guilty verdicts. See, e.g., *Edwards v. State*, 308 Ga. 176, 184 (839 SE2d 599) (2020); *Jackson*, 306 Ga. at 80-81; *Parks v. State*, 300 Ga. 303, 308 (794 SE2d 623) (2016). The improperly admitted other acts evidence in many such cases was not especially prejudicial, for example because the other act was relatively benign or was cumulative of properly admitted evidence. See, e.g., *Kirby*, 304 Ga. at 487 ("[T]he jury was already aware that [Appellant] had committed other violent crimes. And any prejudice from the evidence that he had committed two other sets of violent crimes rather than one other set was easily offset by the other compelling evidence against Appellant."); *Hood v. State*, 299 Ga. 95, 106 (786

SE2d 648) (2016) (concluding that the improper admission of evidence of the appellant's prior drug dealing was harmless in light of the strong evidence that he committed the crimes and the other, properly admitted evidence that he had dealt similar drugs on other occasions to other people). In this case, by contrast, the other acts evidence was highly prejudicial and not at all cumulative – there was no other evidence of Appellant's involvement in violent acts – and the evidence that Appellant committed the charged crimes was not compelling.

The prejudicial effect of the evidence that Appellant committed the later crimes was substantial. The vague evidence from Newton's statement that Appellant and an unidentified associate stole a purse from a woman in an unspecified way might not have been especially damaging to Appellant's character. But the evidence regarding how he obtained the vehicle used to commit that crime was extremely prejudicial. Appellant did not just take a car; he took a four- or five-year-old child, after assaulting another young child by pushing him out of the car. In fact, when the prosecutor began questioning

Newton about the later crimes, the prosecutor described them as an "incident that occurred involving a kidnapping." The kidnapped child testified about her terrifying experience, along with three other witnesses called by the State – Brown, the mother whose child and car had been taken; Newton; and Detective Gosart.

In addition, the State did not present any evidence that Appellant had been or would be punished for the later crimes. In his testimony, Appellant denied committing these crimes, and although the prosecutor said, when questioning Appellant on cross-examination, that the case about the later crimes was still pending, that was only an attorney question, not evidence; even if we were to consider it as evidence, there was no evidence that Appellant would actually be tried for and convicted of those serious crimes after the murder trial was finished. See *Jackson*, 306 Ga. at 79-80 (explaining that the lack of evidence that the appellant had been prosecuted, admitted his guilt, and served a sentence for his other criminal act "increased the risk that the jury would want to punish Appellant for his past conduct rather than only for the charged crimes"); *United*

*States v. Beechum*, 582 F2d 898, 914 (5th Cir. 1978) (explaining that the danger that the jury may convict the defendant for the extrinsic offense "is particularly great where, as here, the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged").

On the other hand, the evidence that Appellant was guilty of the charged crimes was not strong. We will parse back through the evidence, because it looks different when not viewed only in the light most favorable to the guilty verdicts as we did in evaluating its legal sufficiency in Division 2 above. We note first that the only direct evidence of Appellant's involvement in the crimes came from the recorded statement of Newton, Appellant's one-time cellmate who was trying to make a deal to get out of his prison sentence when he made the statement and then refused to repeat the statement under oath at trial. See footnote 7 above. The rest of the evidence against Appellant was circumstantial and not particularly compelling.

Oliver, who was the only eyewitness who identified Appellant

in relation to the crime scene, testified that she saw him talking on his phone outside the store near the Everses' house at the time of the crimes. But she did not see Appellant come, go, or interact with the direct perpetrators of the crimes, and she did not tell Detective Gosart about even the alleged store sighting when the detective interviewed her just hours after the crimes and "multiple times" thereafter. She mentioned that observation for the first time three years later in a pretrial interview and then waffled in her apparently glassy-eyed testimony about whether Appellant was the "D" she saw by the store. See footnote 3 above. Daniel's friend testified that Appellant knew Daniel had a large amount of cash, but Appellant was not the only person who knew about Daniel's cash and drug dealing. Worthy testified that Appellant was known "in the streets" as "Mastermind," but there was no evidence that Appellant got that nickname by planning crimes; even though Appellant testified, no evidence was presented that he had previously been convicted of any crime.

Appellant's cell phone was in the area of the Everses' house

during the crimes, but Appellant lived off the same road as the Everses. His phone also traveled to the area of the Four Seasons Apartments shortly after the murder, but this location and movement, as well as the cell phone records generally, were probative only because they linked Appellant to Stephens, who the State alleged was a direct perpetrator of the crimes along with Smith and Woodall. Appellant was linked to Smith through Appellant's use of Smith's phone card in jail.

Those links, however, were of limited value in proving Appellant's involvement in the crimes because of the limited evidence presented to the jury that Stephens and, even more so, Smith or Woodall were themselves involved in the crimes.[20] According to Worthy, Stephens took what would become the murder weapon from the Four Seasons Apartments two days before the

---

[20] This unusual circumstance distinguishes this case from most cases in which a defendant is accused of being a party to crimes committed directly by other persons; in most cases, the identity and culpability of the direct perpetrators is clearly established. See, e.g., *Robinson v. State*, 298 Ga. 455, 455-457 (782 SE2d 657) (2016). In this case, whether due to an absence of evidence or the State's failure to present more evidence because the direct perpetrators were not on trial with Appellant, the identity of those persons was not strongly proved.

crimes (although Woodall had brought the gun to the apartment); Stephens's phone pinged on a cell tower seven-tenths of a mile from the Everses' house around the time of the crimes; and Stephens's age and – per some unidentified part of Detective Gosart's investigation – hairstyle at the time matched the description of the gunman (although none of the four witnesses who saw some or all of the perpetrators identified Stephens before or during the trial). Smith's connection to the crimes was more tenuous: he was also a young man, and he was in the apartment with the murder weapon two days before the crimes. Woodall was also a young man who Worthy said had possessed the murder weapon two days before the crimes, but there was no evidence of any direct link between Woodall and Appellant. Moreover, the State presented no evidence of contacts between Appellant and any of the alleged direct perpetrators before the day of the charged crimes or in the days immediately thereafter.

Finally, Appellant's own statements provide some, but again not compelling, evidence against him. His statement during the jail

call that everybody was "staying solid" or "staying silent" supports only a weak inference of culpability, particularly because the context of the statement was not explained. Appellant did not present any evidence to corroborate his testimony about his activities on the day of the crimes, which included admissions of drug dealing, but his story remained consistent throughout his testimony and he was not significantly impeached. Although his theory that Newton obtained the information that he told Detective Gosart from Appellant's discovery packet in their cell was weakened because Appellant acknowledged that the discovery did not say that he went to the Four Seasons Apartments after the crimes, Newton did not actually say in his statement that Appellant went to the Four Seasons Apartments (instead he agreed when the prosecutor characterized his words that way at trial).[21]

---

[21] As discussed in footnote 9 above, the District Attorney contends on appeal that text messages from Appellant's phone records indicating that a woman tried to purchase drugs from him on the day of the murder and that Appellant did not respond to her during the time of the crimes undermined his story about traveling to the Four Seasons Apartments to sell drugs that day. But even assuming that those texts weakened Appellant's story, it is unlikely

By comparison to this shaky evidence that Appellant was an across-the-street party to the commission of the charged crimes, the jury was presented evidence, including an eyewitness identification, that Appellant directly committed the later serious crimes for which he had not been punished, and the trial court instructed the jury three times that it could consider Appellant's commission of those later crimes for a variety of purposes – to prove Appellant's motive, intent, plan, and identity in committing the charged offenses. As we held above, the jury should not have been authorized to consider the other acts evidence for *any* of those purposes. Those instructions were particularly problematic because, given the evidence that Appellant was, at most, a party to the crimes charged, his identity

---

that the jury actually considered them. The relevant text messages were part of a 36-page exhibit showing Appellant's cell phone activity that was sent back with the jury during deliberations, but the texts at issue were never discussed during the trial. After introducing the exhibit, the State asked only about the times and locations of Appellant's incoming and outgoing phone calls. Near the beginning of the exhibit, there are six pages of Appellant's incoming and outgoing text messages in small font. It strikes us as unlikely that the jury would have parsed this document in the absence of any attention being drawn to it during the testimony. See *Thompson*, 302 Ga. at 542 ("'[W]e weigh the evidence as we would expect reasonable jurors to have done . . . .'" (citation omitted)).

and intent were the crucial issues in the case. Compare *Howell v. State*, 307 Ga. 865, 875-876 (838 SE2d 839) (2020) (holding that evidence of a prior crime was harmless in light of the other strong evidence against the appellant; the evidence that the appellant had pled guilty to and was punished for the other act, which was just a misdemeanor battery; and the limiting instruction directing the jury to consider the evidence only for intent, which was not a major issue in the case).

For all of these reasons, we cannot say with confidence that it is highly probable that the trial court's error in admitting the evidence of Appellant's later crimes under Rule 404 (b) did not contribute to the jury's guilty verdicts on the charged crimes. See, e.g., *Brown*, 303 Ga. at 164 (holding that improperly admitted evidence that the appellant had been involved in two prior shootings was not harmless when the evidence proving the appellant's guilt was not overwhelming); *Thompson*, 302 Ga. at 542 (holding that improperly admitted evidence of a later attempted robbery was not harmless despite evidence that Appellant's phone was near the

crime scene, the shifting testimony of an accomplice, and the abandonment of the car used in the crimes near the defendant's home); *Brooks*, 298 Ga. at 727-728 (holding that the erroneous admission of other acts evidence was not harmless where "while evidence of appellant's guilt was sufficient to convict, it was not overwhelming," and the improperly admitted evidence of the murder of a state trooper was extremely prejudicial). We therefore reverse Appellant's convictions.

*Judgment reversed. All the Justices concur.*

DECIDED JUNE 16, 2020.
Murder. Clayton Superior Court. Before Judge Collier, Senior Judge.

*Randall P. Sharp*, for appellant.

*John E. Fowler, Acting District Attorney, Christopher Sperry, Elizabeth A. Baker, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General*, for appellee.