311 Ga. 1
FINAL COPY

S20A1469. FINNEY v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Benjamin Finney, who was a drug dealer in Macon, was convicted of felony murder and two firearm crimes based on the fatal shooting in 2008 of Gwendolyn Cole, the mother of one of Appellant's rivals. In his appeal to this Court, Appellant argues, among other things, that the trial court erred by admitting hearsay from an accomplice, plainly erred by failing to give a jury instruction on the accomplice-corroboration requirement, and erred by admitting evidence of Appellant's involvement in two prior shootings. We agree that the trial court erred in these ways, and because the cumulative effect of the errors likely affected the outcome of Appellant's trial, we reverse his convictions.[1]

---

[1] The crimes occurred on February 4, 2008. In January 2013, a Bibb County grand jury indicted Appellant and Marlon Jackson for malice murder, felony murder based on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony; Appellant was also

1. (a) The evidence presented at Appellant's trial showed the following.[2]

*The Break-In at Appellant's House*

In the fall of 2007, Appellant lived with his girlfriend Kokethia Sledge and her two young children in Macon. One night in September, their home was broken into by two or three people. The assailants held Appellant and Sledge at gunpoint, tied them up, and put a mattress on top of them. The children, who were in their rooms, slept through the incident. About $30,000 in cash, 300

charged with possession of a firearm by a convicted felon. Appellant's and Marlon's trials were severed. Appellant filed a pretrial motion to suppress wiretap evidence, which the trial court denied. On interlocutory appeal, this Court reversed the trial court's order. See *Finney v. State*, 298 Ga. 620 (783 SE2d 598) (2016). Appellant was then tried from October 31 to November 9, 2016; the jury found him not guilty of malice murder but guilty of the other charges. The trial court sentenced Appellant to serve life in prison for felony murder and five consecutive years for each firearm count; the aggravated assault count merged.

Appellant filed a timely motion for new trial, which he amended twice with new counsel in January 2020. In March 2020, after an evidentiary hearing, the trial court denied Appellant's motion but vacated his two firearm convictions on the ground that they were indicted outside the four-year statute of limitation for those crimes. Appellant then filed a timely notice of appeal, and the case was docketed to the August 2020 term of this Court and submitted for a decision on the briefs.

[2] Because this case requires an assessment of the harmful effect of trial court errors, we lay out the evidence in detail and not only in the light most favorable to the verdicts.

2

pounds of marijuana, and two kilograms of cocaine were taken; the stolen drugs were worth more than $300,000. Appellant did not know who the perpetrators were.

Sledge testified that because she was terrified by the home invasion, she went to a pawn shop and purchased two Glock pistols and ammunition. A month later, she and Appellant went to a different pawn shop, where she bought a Bushmaster AR-15 rifle and .223-caliber ammunition for the rifle. Appellant was a convicted felon, so he could not lawfully buy firearms himself, but he helped Sledge pick out the rifle and gave her money to buy it. Sledge kept the Glock pistols in her nightstand, and she kept the rifle near her bed when she was alone. She last saw the rifle when Appellant had it in December 2007.

*The Shooting at Recardo Jackson's House on Sylvester Circle*

According to Appellant's friend Bobby Mack, on November 9, 2007, Appellant asked Mack to buy some guns. Appellant drove Mack to a pawn shop, where Appellant suggested what guns to buy and loaned Mack $53. Mack purchased two Bushmaster AR-15 rifles

3

and .223-caliber ammunition. That evening, Mack gave the rifles to Appellant to keep at Appellant's house because Mack lived in government housing and was not allowed to keep guns in his home. Mack never shot either of the rifles and did not see them again before Cole's murder.[3]

On November 11, two nights after Mack said that he gave Appellant the rifles, one of the rifles was used to shoot at Recardo Jackson's house on Sylvester Circle. Recardo, Recardo's wife, their son, her brother, and her grandmother were home at the time of the shooting. Recardo's wife was shot in the thigh, and gunshots caused Recardo's car to catch on fire. Recardo and his wife did not know who shot at their house. A total of 26 .223-caliber cartridge cases were found at the scene; nine were from one of the rifles Mack had bought, and 17 were from another rifle that was never recovered.[4] Mack

---

[3] Mack later pled guilty in federal court to aiding a convicted felon in obtaining a firearm and was sentenced to three years on probation and a $1,000 fine. As part of his plea agreement, he was required to provide all information that he knew about Appellant.

[4] As explained below, this rifle was also used in the shooting that killed Cole.

testified that he was not involved in the shooting, and he did not indicate that he knew who did it.

After the shooting, Recardo talked to Appellant; he and Appellant were so close that Recardo called Appellant his "brother." Like Appellant, Recardo sold drugs, and Appellant sympathized with Recardo's experience, suggesting that the same people had attacked both of them. Later, Recardo learned that there was a rumor "in the streets" that he knew who robbed Appellant. Recardo told Appellant that the rumor was not true, and Appellant responded, "you my brother, all this s**t ain't nothing but a bunch of jealousy." Recardo explained that he and Appellant did not spend much time together after that because Recardo got a new job, but they still "love[d] each other." Around the end of 2007, Appellant began spending time with Marlon Jackson, another drug dealer. When Marlon described the Sylvester Circle shooting to his brother Marquis Sanford, Marlon said that Recardo "had them f**ked up"

and "business had to be handled."[5]

*The Incident with Frankie Barnes on Lawton Avenue*

On January 20, 2008, Frankie Barnes came into a house on Lawton Avenue where Appellant was visiting with Mack and some other friends. Barnes was carrying a rifle and said that he was looking for Appellant because he had heard that Appellant was looking for him. According to Mack, Barnes said that he was "finna make everybody clear out" and asked who Appellant was; then "the shooting started." Mack did not see who was shooting, but he saw that Appellant had a nine-millimeter gun with him that day. Another witness, however, testified that Appellant did not have a gun and that the man with the rifle came in and "just started shooting." Barnes testified that he did not shoot. No one was injured during the altercation, and Appellant left with Mack.

*The Super Bowl Party Fight between Appellant and Rose*

Sometime during the first few days of February 2008, a man

---

[5] At the time of Appellant's trial, Sanford was serving a 15-year prison sentence for armed robbery and other crimes. The State had agreed that if he gave truthful testimony, he could petition for a sentence reduction.

who was at Marlon's drug house to buy drugs overheard Appellant saying to Marlon that they needed to "get" Alphonso Rose, Jr. Marlon replied, "we've got to do what we got to do."[6] Rose testified that he had worked with Appellant in the drug business, but he cut ties with Appellant in October 2007 because he got his own drug house and did not need Appellant anymore.

According to Rose, on February 3, 2008, he was at a Super Bowl party when Appellant walked in and hit him on the head with a pistol. The two men then fought. Appellant, who was so angry that he was "foaming at the mouth," "put [the gun] in [Rose's] face" and asked if Rose had robbed him. Another party attendee tried to break up the fight, and Rose tried to tell Appellant that a woman Appellant was seeing was actually the person who "set [him] up" to be robbed. Appellant grabbed Rose's necklace, which was worth $10,000, off his neck and walked away. That night, Appellant called Rose and told him, "I know how to hurt you," "If I was trying to hurt you, . . . I'll

---

[6] This witness was in jail on a pending burglary charge, and the State had agreed to recommend a sentence of probation if he testified truthfully.

go to your momma house," and "I know where your mom stay." Rose said that Appellant probably thought that Rose lived with his mother, but he did not.

*The Shooting at the Spradley House*

The next morning, February 4, Marlon learned that drug houses belonging to him and two of his brothers had been shot at. Appellant visited those drug houses at some point that day, and Marlon's brother Sanford heard Appellant say, "a house for a house" and "a family for a family." Rose testified that Marlon called him and accused him of being the shooter. Rose said, "Y'all want to settle this now or what."

That afternoon, Rose drove with two of his friends, who were members of the Mafia Gang, to the house of Tim Spradley's family on Hawkinsville Avenue, bringing multiple guns with them.[7] Appellant was with Marlon and several other people near the Spradley house. Rose testified that as he drove up, Appellant "r[an]

---

[7] Spradley testified that at the time, his grandfather, aunt, and uncle lived at the Hawkinsville Avenue house, but he did not live there.

out [of] the yard with his gun in his hand . . . like he was going to cut the truck off"; Rose drove past Appellant, made a u-turn, and drove back toward Appellant; Rose then "opened and returned fire" at Appellant with a stolen nine-millimeter gun. Then Rose drove away, eventually leading the police on a car chase from which he escaped.[8] Johnny Anderson, who had a close relationship with Spradley, was in the yard at the time of the shooting and was shot in the shoulder. Rose was later charged with an unspecified crime for injuring Anderson, but that charge was dead-docketed.[9]

Rose's mother, Gwendolyn Cole, heard about the shooting and her son's flight from the police. She and her sister Sonja Russell went to the Spradley house; the police were there when they arrived. Russell talked to Spradley, who was "visibly upset." She asked why

---

[8] Another witness at the Spradley house testified that when Appellant saw Rose drive through, Appellant ran to a car, grabbed a pistol, and started walking toward the road. Then "Appellant made a shot. And they start shooting back." One of Marlon's brothers testified that someone in Rose's vehicle started shooting first, and Appellant shot back. Spradley testified that he saw only Rose shoot, but he heard other people shooting.

[9] Rose testified that although he met with the prosecutor regarding his testimony against Appellant around the time that the charge was dead-docketed, no deal "was arranged."

9

he and Rose were fighting, saying they were supposed to be friends. Spradley responded: "They done came up here and shot up this yard, he done shot my uncle. What if somebody go down there and shoot up his momma house? What if somebody shoot up his momma house?"[10] Russell told Spradley, "They said that you pistol whipped him," and Spradley responded, "No, I didn't. But when I see him, I am."[11] Russell and Cole then left Hawkinsville Avenue, and Russell dropped Cole off at Cole's home around 9:00 p.m.

*The Murder of Gwendolyn Cole*

Around 10:00 that night, Cole was at her house talking on the phone to her ex-husband, who lived nearby, when someone knocked on her door. She told her ex-husband to hold on, and he then heard the following. Cole walked to the door and asked who was there. The person responded, "Wayne," and asked if Rose was home. Cole said no, and then gunfire started. Cole began screaming, and the ex-

---

[10] Spradley was apparently referring to Anderson as his uncle. He testified, however, that he and Anderson were not related, although he and Hodges, who was Anderson's nephew, were cousins.

[11] This account of the conversation came from Russell. When Spradley testified, he admitted talking to Russell but denied making these statements.

husband called the police and started running toward Cole's house. Two of her neighbors heard numerous gunshots. Another neighbor looked outside after hearing gunshots and saw three men running through a field away from Cole's house.[12] Another neighbor, who was 11 or 12 years old at the time, heard gunshots and looked out his window. He saw two men shooting; the shorter man was wearing a white shirt and jeans, and the taller man was wearing a black shirt and jeans.[13]

Cole suffered multiple gunshot wounds. She was taken to the hospital, where she died from her injuries early the next morning. A total of 72 .223-caliber cartridge cases were collected from the scene; 51 were fired from the Bushmaster rifle that Appellant's girlfriend Sledge bought with him about three months earlier, and the other

---

[12] The neighbor gave this account to Detective David Patterson, the lead detective in this case, but at trial she denied both seeing anyone and telling the detective that she saw anyone. Detective Patterson also testified that the neighbor said that Appellant unexpectedly came to her house the next day to check on her. She denied that this happened or that she told the detective this.

[13] This account is again what the witness told Detective Patterson. The witness testified at trial that he did not remember anything that he saw. There was testimony that Appellant was shorter than Marlon, and a witness who saw Appellant earlier in the day of the shooting testified that Appellant was wearing a white t-shirt and jeans.

21 were fired from one of the rifles used in the Sylvester Circle shooting (the rifle that was never recovered).

Rose was called about the shooting at his mother's house soon after it happened. He initially thought that Spradley and Dexter DeWayne Hodges, who went by "Wayne" and was Anderson's nephew, were responsible. Rose told a police officer that Spradley had been calling his phone throughout the day enticing him to fight.[14] Soon after the shooting, Rose called Spradley, and Spradley said that he was at an Applebee's restaurant; Rose could hear someone else ordering food in the background. Rose believed that Spradley did not have enough time to get from his mother's house to Applebee's and be ordering food, so Rose decided that Appellant committed the shooting. Spradley testified that he went to Applebee's that night with three of his cousins — Eric Williams, Ronald Green, and Hodges.[15] Hodges testified that he was not angry

---

[14] Spradley testified that he did not call Rose after the shooting at his family's house.

[15] Williams and Hodges also testified that Hodges was in the group at Applebee's that night. Green did not testify, but Detective Patterson testified

12

at Rose for shooting Anderson, because Rose and Anderson were close so everyone understood that Rose shooting him was just a mistake.

On the night of the murder, Appellant's girlfriend Sledge and her children stayed at a hotel with his close friend, whom Appellant had asked to watch over them. Appellant, Sledge, and the children then spent the next several nights in different hotels and then at a campground. Sanford, Marlon's brother, testified that one of their other brothers told him on the night of the murder to go to a hotel because "something had happened that he didn't think was right" and said, "I told Ben and them not to do that."

---

that Green told him Hodges was with them. When Spradley initially spoke to Detective Patterson, however, he named only Williams and Green as being at Applebee's. Hodges testified that he went to Hawkinsville Avenue after someone called and told him that his uncle (Anderson) had been shot. Spradley, however, testified that Hodges never came to Hawkinsville Avenue, but instead Spradley picked up Hodges and told Hodges about the shooting on the way to Applebee's. Spradley did not specify what time they were at Applebee's in his testimony, other than to say they were there for "last call," but he told Detective Patterson that they got to the restaurant around 10:00 p.m. Detective Patterson testified that the Applebee's closed at 10:00 p.m. for to-go pick-up and 11:00 p.m. for dine-in service. Hodges testified that they picked up food from Applebee's, whereas Spradley and Williams testified that they ate at the restaurant.

*The Murder Investigation*

A week after the murder, on February 11, 2008, Detective David Patterson, the lead investigator on the murder case, spoke with Mack and asked where the two Bushmaster rifles he had bought were. Mack then called Appellant and asked for the guns. Appellant brought one rifle back to Mack, but told Mack that the other rifle was "in the streets" because someone had stolen it.[16] Mack gave the returned rifle to the police; it was the rifle matched to the Sylvester Circle shooting. The following month, March 2008, a police officer whom Rose knew recorded a call between Rose and Mack about the Bushmaster rifles. Mack denied that he bought the rifles for Appellant, but he also said, "Ben made his bed; he can lie in it now." Also in March 2008, Leon Paul, Jr., talked to Appellant at a car wash located near Cole's house. Appellant was carrying an "assault rifle," and he pointed his finger at Cole's house and said

---

[16] Recardo testified that "you can get a gun in the streets quicker than you can get 100 dollars in the street," and that guns trade hands quickly and frequently.

14

that he and Marlon were the ones who "shot that lady's house up."[17]

During a traffic stop of Appellant's car on March 9, 2008, the police found cocaine and a Glock pistol. Five days later, the police searched Appellant and Sledge's house and found, among other things, two owner's manuals for a Bushmaster AR-15 rifle and two Glock pistols. Based on his possession of the cocaine and the three guns, Appellant pled guilty to drug and firearm crimes in federal court in January 2009 and was sentenced to serve 70 months in federal prison, which he served in Forrest City, Arkansas.

In September 2010, 21 months after Appellant was sentenced for his federal crimes, the Bushmaster rifle that Sledge had purchased was found in a bag in some woods in Macon. The bag had Jeffery Harris's fingerprint on it. In addition to firing 51 of the .223-

---

[17] Although Paul was first interviewed by the police in March 2008, shortly after this conversation with Appellant allegedly happened, he did not mention the conversation. In May 2008, Paul was shot by Appellant's nephew and had to spend over a week in the hospital; Paul believed that Appellant told his nephew to do it. Paul was interviewed again in October 2008, and he gave the above account. At trial, Paul changed his story somewhat, testifying that Appellant pointed in the direction of Cole's house and said, "We took care of that. We handled that." On cross-examination, Paul testified that Appellant "wasn't out there waving around [a rifle] confessing nothing," although he also answered "mm-hmm" when asked if Appellant "confessed."

caliber cartridge cases found at Cole's house in February 2008, the rifle had been used in a shooting at a home in Macon in August 2010. In that incident, much like in the shooting at Cole's house, someone knocked on the door of a home and then shot into the home when a person inside answered. One man was killed and another was injured.[18]

Martavious Mercery, who had been in jail with Appellant, testified that Appellant said that he "had got into it" with Rose because he used to give drug-dealing work to Rose, but Rose ended up robbing him. Appellant said that they "started shooting; and [doing] all type of stuff at each other, shooting each others' spots up and stuff like that." Appellant then said that "they say [Appellant] went – and went by the guy mom's house, or whatever, and shot the house up."[19]

---

[18] Aja Stanley was later charged with this murder. Stanley had a connection to Harris, but there was no evidence presented that either Stanley or Harris had a connection to Appellant or to Cole's shooting.

[19] Mercery was serving a 10-year sentence in state prison and facing a consecutive 92-month federal sentence for drug and firearm crimes. Mercery testified that in exchange for his truthful testimony, he would be allowed to seek a sentence reduction.

As the final witnesses in the State's case other than Detective Patterson, Hugh Wright, Jr., and Trion Williams testified that they contacted law enforcement after Marlon shared information about the shooting with them, and they were first interviewed in June 2011. The two witnesses testified that they had been in federal prison in West Virginia with Marlon.[20] Marlon, who had recently had a phone call with his grandmother, told the men that he was supposed to be going home soon, but his grandmother said that "people" were talking about a murder in the neighborhood and Marlon was worried that his "brother" was going to "tell on him." Marlon said that he and "his co-defendant" had gone to Rose's house. His co-defendant went to the door and talked to Rose's mother through the door. Rose's mother said that Rose was not home, and

---

[20] The record indicates that in October 2008, Marlon pled guilty in federal court to possession of a firearm by a convicted felon (but this information was not presented to the jury). Wright and Williams testified that they had been convicted of drug crimes. At the time of trial, Wright had just finished his federal sentence and was beginning a state sentence in Virginia, and Williams had 14 years of his federal sentence left to serve. Both men testified that if they gave truthful testimony, they could seek to have their sentences reduced. On cross-examination, Williams further asserted that, unlike in the state system, the federal rules guaranteed that his sentence would be reduced for his cooperation.

17

the co-defendant opened fire on the house. Marlon then began to shoot as well. Marlon explained that "a girl" had bought three rifles for them, and they used at least one of them in the shooting. Wright also testified that Marlon said when they finished, the scene looked like "something out of Baghdad," and they had "swis[s]-cheesed the whole house up." Marlon did not tell either inmate the name of his co-defendant, but he said that his co-defendant was in federal prison in Forrest City, Arkansas (where Appellant was serving his federal sentence after his federal conviction in January 2009).

Neither Marlon nor Appellant testified at Appellant's trial. Appellant's defense theory was that someone else committed Cole's murder, pointing mainly at Spradley and Hodges, who also had a motive to attack Rose or his family.

(b)    Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's soon-to-end practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence admitted at trial was

18

sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (explaining that in evaluating the legal sufficiency of the evidence, "'[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence'" (citation omitted)). See also *Kennebrew v. State*, 299 Ga. 864, 867-868 (792 SE2d 695) (2016) ("[I]n determining the legal sufficiency of the evidence, we consider all of the evidence that was admitted at Appellant's trial, even though some of the evidence should have been excluded.").[21]

2. We begin by considering three enumerations of trial court error raised by Appellant. We agree with him that the trial court erred in all three respects.

---

[21] We remind litigants that the Court will end our practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

(a) Appellant first contends that the testimony of Marlon's former prison-mates, Wright and Williams, recounting what Marlon told them about Cole's murder was inadmissible hearsay. The trial court admitted this testimony over Appellant's hearsay objection, ruling that Marlon's statements were admissible under the hearsay exception for statements made by a co-conspirator to further the conspiracy during its concealment phase. See OCGA § 24-8-801 (d) (2) (E) (excluding from the hearsay inadmissibility rule "[a] statement by a co[-]conspirator of a party during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of a conspiracy"). We review this evidentiary ruling by the trial court for an abuse of discretion. See *State v. Lane*, 308 Ga. 10, 20 (838 SE2d 808) (2020).

At the time of Marlon's statements, he and Appellant had not yet been charged with crimes related to Cole's murder, and it may be that their alleged conspiracy to commit those crimes was still in its concealment phase. In any event, however, there is no indication that Marlon was sharing details of those completed crimes to

20

advance the interests of that conspiracy when he spoke to two federal prison inmates in West Virginia who had no other apparent connection to Marlon, Appellant, their criminal scheme, or even the state of Georgia. Instead, Marlon's statements worked against the concealment of the conspiracy: they "merely 'spill[ed] the beans,' disclose[d] the scheme, [and] inform[ed] the listener[s] of the declarant's activities." *Lane*, 308 Ga. at 20. See also *State v. Wilkins*, 302 Ga. 156, 159-160 (805 SE2d 868) (2017) ("(A) retrospective statement regarding matters that have already occurred, and that is not intended to foster involvement in the conspiracy, is not a statement in furtherance of the conspiracy." (citation and punctuation omitted)). Compare *Kemp v. State*, 303 Ga. 385, 395 (810 SE2d 515) (2018) (holding that the trial court was authorized to conclude that statements the appellant made to a fellow gang member in the local jail were made in furtherance of a conspiracy to engage in ongoing criminal gang activity, because they "could be interpreted as fostering cohesiveness with another gang member or as providing information to a fellow co-conspirator (of the criminal

21

street gang)"). The trial court's finding that Marlon's statements furthered the conspiracy was unsupported by the record, and the court therefore abused its discretion by admitting Wright's and Williams's testimony under OCGA § 24-8-801 (d) (2) (E). See *Lane*, 308 Ga. at 20.

(b) Under OCGA § 24-14-8, "[t]he testimony of a single witness is generally sufficient to establish a fact," but in felony cases the testimony of an accomplice must be corroborated by other evidence. This corroboration requirement applies even when the accomplice does not testify in court, if his statements are admitted through another witness. See *State v. Johnson*, 305 Ga. 237, 238 (824 SE2d 317) (2019) (rejecting the State's argument that "an [accomplice-corroboration] instruction . . . is not clearly required where a witness other than the accomplice introduces an accomplice's statement implicating defendant's guilt").

Appellant contends that because Marlon's statements were (improperly) admitted at trial and the evidence clearly supported a finding that Marlon was an accomplice in the charged crimes, the

trial court should have given the jury an instruction about the requirement of accomplice corroboration. Because Appellant did not object to the jury instructions at trial, our review of this claim is limited to plain error. See *Doyle v. State*, 307 Ga. 609, 611 (837 SE2d 833) (2020). To demonstrate plain error, an appellant must show, in part, that he did not affirmatively waive the error and that the error was "clear or obvious, rather than subject to reasonable dispute." Id. at 611-612 (citation and punctuation omitted).[22]

There is no indication that Appellant affirmatively waived an accomplice-corroboration charge. And the trial court not only failed to inform the jury of the accomplice-corroboration requirement, but also instructed the jury that "[t]he testify [sic] of a single witness if believed is sufficient," and "[g]enerally there is no legal requirement of corroboration of a witness." The trial court therefore clearly and obviously erred in instructing the jury as to how it could consider Marlon's statements admitted through Wright's and Williams's

_____

[22] We discuss the other two parts of the plain error test, which deal with the effect of the error, in Division 3 (a) below.

testimony. See, e.g., *Doyle*, 307 Ga. at 613 ("On multiple previous occasions, we have held that giving the single-witness instruction, while failing to give the accomplice-corroboration instruction, in a case where the defendant was directly linked to the crime through the testimony of an accomplice, deviates from the plain language of OCGA § 24-14-8 and constitutes a clear and obvious error.").[23]

(c) Finally, Appellant contends that the trial court erred by admitting, over his objection, evidence of the Sylvester Circle shooting and the Lawton Avenue incident pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)"). The court ruled before trial, based on the State's notice of its intention to introduce evidence of those incidents and Appellant's response, that the evidence was admissible to show motive — although when the evidence was admitted during the trial, the court did not instruct the jury that the evidence could be

---

[23] We note that "'when conducting review of asserted plain error . . . , whether an error is "clear or obvious" is judged at the time of the appellate court's review,'" not at the time of the trial. *Doyle*, 307 Ga. at 613 n.4 (citation omitted).

24

considered only for that one, limited purpose.[24] As described in more detail in Division 1 (a) above, in the Sylvester Circle shooting about three months before Cole's murder, two rifles (one of which belonged to Mack, who said that he left it in Appellant's possession two days earlier) were used to shoot at Recardo Jackson's house, injuring Recardo's wife and catching Recardo's car on fire. In the Lawton Avenue incident about two weeks before the murder, Frankie Barnes came to a house that Appellant was visiting looking for Appellant, and then Barnes, Appellant, or both men fired guns.

Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but such other acts evidence is admissible for other purposes, including to prove motive. The party offering the evidence must show:

> (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is

---

[24] The trial court did not rule that any of the evidence regarding these incidents was admissible as "intrinsic" evidence not subject to Rule 404 (b), so we also do not address that issue.

25

sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Strong v. State,* 309 Ga. 295, 300 (845 SE2d 653) (2020). To be relevant to show motive, "'the extrinsic evidence must be logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged.'" Id. at 312 (quoting *Kirby v. State,* 304 Ga. 472, 486-487 (819 SE2d 468) (2018)).

At trial, the State tried to link the two prior incidents to the charged crimes by arguing that Appellant acted in the prior incidents and in the charged shooting with the same motive – revenge for the break-in and robbery at his house. The evidence, however, failed to connect either prior incident to the break-in. As to the shooting at Recardo's house on Sylvester Circle, Recardo testified that at some point after that incident, he heard a rumor that he knew who had robbed Appellant, but Appellant indicated that he did not believe the rumor. Recardo testified that he and Appellant described themselves as "brother[s]" and "love[d] each other," and Appellant suggested that the same people had attacked

26

both of them. Marlon's brother Sanford testified that Marlon described the Sylvester Circle shooting as handling "business" because Recardo "had them f**ked up," but there was no indication that the business involved the break-in at Appellant's house or that the "them" included Appellant.

The evidence of the Lawton Avenue incident was even less helpful to the State's motive argument, because it showed that *Barnes* was looking for Appellant and instigated the violence. Even if Appellant then used violence in response to Barnes, his motive was to defend himself; there was zero evidence that Appellant acted against Barnes to get revenge for his house break-in.[25]

Thus, the State failed to prove that Appellant's actions in the prior incidents were motivated by a desire to get revenge for the break-in at his house. The motive that the State really ascribed to Appellant based on these incidents was the generic motive that he

---

[25] On appeal, the State also argues that the Lawton Avenue incident showed that Appellant had the motive to shoot people "who were looking for him." But there was no evidence that Recardo or (more importantly) Cole was looking for Appellant when he allegedly went to their houses and shot at them.

regularly engages in violent acts against others, and that is not a proper purpose under Rule 404 (b). See *Strong*, 309 Ga. at 312 (holding that the State's argument that the other acts showed the defendant's motive "'to control other people' with violence . . . 'is a classic improper propensity argument, focusing on [his] violent . . . character'" (citation omitted)); *Kirby*, 304 Ga. at 487 (holding that the State's argument that the other acts showed the defendant's "'inclination' to use violence to obtain money and sex . . . is a classic improper propensity argument, . . . identifying [the defendant's] motive to act in far too generic a fashion"). The evidence of the two prior incidents was not relevant to prove Appellant's motive in committing the charged crimes, and the trial court abused its discretion by admitting that evidence for that purpose.[26]

3. (a) The trial court's errors require reversal of Appellant's convictions unless the errors can be deemed harmless. See *Strong*,

---

[26] Because the State failed to show that the evidence of the prior incidents was relevant to show Appellant's motive in the crimes charged, which was the only purpose for which the trial court admitted the evidence, we need not address the other two parts of the admissibility test under Rule 404 (b).

309 Ga. at 316. "In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." Id. (citation and punctuation omitted). We recently held that "Georgia courts considering whether a criminal defendant is entitled to a new trial should consider collectively the prejudicial effect of trial court errors . . . at least where those errors by the court . . . involve evidentiary issues." *Lane*, 308 Ga. at 14.[27] Although we often

---

[27] Although the failure to give an accomplice-corroboration instruction is a jury charge, rather than an evidentiary, error, it is intertwined in this case with the evidentiary error of the trial court's admission of accomplice hearsay. *Lane* required the cumulative consideration of errors only as to evidentiary errors, leaving for another day the question of whether other types of errors should be considered, see 308 Ga. at 17-18, but *Lane* also recognized that it is "particularly difficult, if not impossible," to determine "whether a criminal defendant's rights are affected in a material way by a trial court['s evidentiary] error" without considering, among other things, "any related jury instructions and arguments by counsel," id. at 15. Indeed, this Court has often considered related jury instructions when evaluating the harmfulness of an evidentiary error, because how a jury was instructed to use evidence may increase or reduce the effect of improperly admitted evidence. See, e.g., *Howell v. State*, 307 Ga. 865, 875-876 (838 SE2d 839) (2020) (explaining that any harm caused by the challenged evidence was mitigated by the court's limiting instruction); *Heard v. State*, 309 Ga. 76, 94 (844 SE2d 791) (2020) (explaining that the trial court's instruction that the jury could consider the inadmissible evidence for a number of improper purposes increased the harm of the evidence). Thus, even

initially address the harm of individual errors, if, as in this case, the cumulative effect of the errors requires reversal, we need not also decide whether any one error, standing alone, would mandate a new trial.

As noted in *Lane*, when considering the cumulative effect of errors, we must "bear in mind the relevant standards [of appellate review] for the errors at issue." Id. at 21. The trial court's erroneous admission of Marlon's hearsay and the evidence of the prior incidents were non-constitutional evidentiary errors that were properly raised at trial, so they are "harmless if the State shows that it is 'highly probable that the error did not contribute to the verdict[s],' an inquiry that involves consideration of the other evidence heard by the jury." Id. (citation omitted). As explained above, the trial court's failure to give an accomplice-corroboration jury instruction is subject to plain error review, under which

---

if Appellant had not raised as plain error on appeal the trial court's failure to give an accomplice-corroboration instruction, this Court could still consider the effect of the lack of that instruction when evaluating the harm caused by the erroneously admitted accomplice hearsay.

convictions will be reversed only if the (unwaived and clear) error "'affected the appellant's substantial rights,'" meaning that it likely affected the outcome of the trial, and the error "'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Doyle*, 307 Ga. at 612 (citation omitted). We need not address how to reconcile the differing standards that apply to the errors here, because even applying the more stringent plain error standard, we conclude that the cumulative effect of the errors requires the reversal of Appellant's convictions. See *Lane*, 308 Ga. at 21-22 ("[I]n most cases a difference in the standards will not make a difference in the result; the collective effect of the various errors will be sufficiently harmful to warrant a new trial, or not.").

(b) There is no question that the evidence of Appellant's guilt was legally sufficient when all of the evidence is viewed in the light most favorable to the prosecution, see Division 1 (b) above, and the evidence was not weak even when weighed as we would expect reasonable jurors to have considered it. But the properly admitted evidence was far from overwhelming. There was substantial

evidence of Appellant's antipathy toward Rose: a drug buyer overheard Appellant telling Marlon that they needed to "get" Rose; the day before the murder, Appellant attacked Rose, accused Rose of robbing him, stole Rose's necklace, and threatened Rose's mother; on the day of the murder, Marlon's brother Sanford heard Appellant say, "a house for a house" and "a family for a family," and Rose and Appellant then shot at each other in front of the Spradley house; and Appellant later discussed his feud with Rose when he was in jail with Martavious Mercery.

There was also evidence that Appellant may have had the means to kill Cole, because the rifle purchased by his girlfriend Sledge was one of the rifles used in the murder. Appellant's clothes on the day of the murder (a white shirt and jeans) matched the description of one of the shooters at Cole's house given by a witness in a statement to the lead detective. Sledge and her children, and later Appellant too, stayed away from their house for several nights after the murder. And there was evidence of what the State focuses on as two "admissions" of the fatal shooting by Appellant: Leon Paul,

32

Jr.'s statement to a detective that a month after the murder, Appellant, who was carrying an "assault rifle," pointed to Cole's house and said that he and Marlon were the ones who "shot that lady's house up"; and Mercery's testimony that Appellant told him, "they say [Appellant] went — and went by the guy mom's house, or whatever, and shot the house up."

But most of this evidence was circumstantial, and other people had the motive and potential means to shoot at Rose's mother as well. As to motive, after Rose's drive-by shooting at the Spradley house injured Tim Spradley's friend Anderson, Spradley threatened Rose, discussed someone shooting up Rose's mother's house, and called Rose throughout the day enticing him to fight; after Cole's house was shot up just a few hours later, Spradley denied making those threats. Also, one of Cole's shooters identified himself as "Wayne," the nickname of Spradley's friend and Anderson's nephew Hodges.[28] As for means, Recardo Jackson testified that guns changed

---

[28] The State presented evidence of an alibi for Spradley and Hodges, but that alibi was supported only by somewhat inconsistent testimony, see footnote

hands quickly and frequently on the street, and although the rifle Sledge purchased was used in Cole's shooting, Sledge did not see the rifle after December 2007 (more than a month before Cole's murder), and that rifle clearly changed hands at least once after that time, because when Appellant was in federal prison in Arkansas, the rifle was used to commit a similar fatal shooting into a house in Macon, and there was no evidence linking Appellant to the persons connected with that shooting.

Moreover, as noted throughout Division 1 (a), most of the significant testimony in this case came from felons who had or were seeking a deal with the State and witnesses who altered or disavowed their prior statements when they testified at trial, and there were competing inferences from other evidence. For example, the witness who had described one of the shooter's rather

14 above, and by Rose's testimony that he heard people ordering food in the background of his phone call to Spradley after the murder. Moreover, although Rose testified that he did not believe that Spradley could have made it from Cole's house to the Applebee's restaurant by the time of their phone call, there was no evidence presented about the distance between the house and the restaurant.

undistinctive clothes was a pre-teen at the time of the crimes and testified at trial that he did not recall seeing anything. And Appellant and his family may have stayed away from their house because they were concerned about retaliation for Cole's murder — or simply concerned about another violent attack by Rose against Appellant and his associates like the one that occurred earlier that day at the Spradley house. Appellant's "admission" to Mercery (who was one of the felon witnesses seeking a sentence reduction) could also be described as simply a statement about what was alleged against Appellant ("*they say* [Appellant] went . . ."). Appellant's statement to Paul would be more damning — except that Paul did not mention that conversation when he was first interviewed by the police shortly after it supposedly happened; he recounted the conversation for the first time in an interview several months later, after he had been shot and badly injured by Appellant's nephew supposedly at Appellant's direction. Even then, he backtracked at trial, testifying that Appellant had actually said more ambiguously, "We took care of that. We handled it."

By contrast, the testimony from Wright and Williams recounting Marlon's statements was the strongest direct evidence that Appellant shot Cole, because that was the only eyewitness evidence about the murder. Wright and Williams each testified that Marlon told them that he and Appellant went to Rose's house, where Appellant knocked on the door and then opened fire after Rose's mother came to the door using at least one rifle that "a girl" had bought for them.[29] Had Marlon testified, he properly would have been able to present his account once, and then he would have faced cross-examination. Instead, through the testimony of Wright and Williams, the State was allowed to improperly present Marlon's account not once but twice, and without cross-examination.

In closing, the prosecutor argued that Wright's and Williams's testimony was credible because they had no other way to know the details of the shooting, as they had no relationship with anyone

---

[29] Although Wright and Williams did not identify Appellant by name, they testified that Marlon referred to "his co-defendant" who was in federal prison in Forrest City, Arkansas. No one at trial disputed that Marlon was referring to Appellant.

involved in the case. The prosecutor also highlighted the particularly damaging description of the shooting from Wright's testimony, saying that Appellant was "guilty of the war zone" at Cole's house. Thus, it is likely that the jury gave significant weight to Marlon's statements improperly admitted through Wright's and Williams's testimony. And not only did the trial court improperly admit this hearsay evidence twice, but the court then committed the clear error of failing to give an accomplice-corroboration charge while giving a single-witness charge, effectively instructing the jury that it could convict Appellant based on Marlon's statements alone. See *Doyle*, 307 Ga. at 614 ("[I]t is likely that the jury convicted Doyle on [the accomplice's] testimony alone, which the jury was affirmatively told that it could do."); *Stanbury v. State*, 299 Ga. 125, 131 (786 SE2d 672) (2016) (holding that the trial court's failure to give an accomplice-corroboration charge likely affected the outcome of the trial when the accomplice "was the only witness who affirmatively identified [the defendant] as the second man" inside the house where the victim was robbed and shot).

The trial court's improper admission of the evidence of the two prior incidents compounded the harm from the accomplice hearsay errors by allowing the State to depict Appellant as a heartless and dangerous man repeatedly involved in gun violence. During closing argument, the prosecutor highlighted the Sylvester Circle evidence by saying that Appellant "once again" fired into a home and hit "an innocent lady," adding that "the person pulling that trigger just did not care; cold blooded heart, only out to prove a point." The prosecutor further argued that the Lawton Avenue incident showed that Appellant was "the one that has the motive that keeps shooting in your city going from November 11, 2007 until January 20, 2008." The prosecutor told the jury that these two incidents reflected "the combination of a cold blooded killer" that led to Cole's murder. To make matters worse, the trial court did not give a limiting instruction, either when the other acts evidence was admitted or in the final jury charge, thereby leaving the jurors free to consider this inadmissible evidence for any purpose, including following the prosecutor's clear suggestion in closing argument that they consider

it impermissibly as evidence of Appellant's violent character. See

*Heard v. State*, 309 Ga. 76, 94 (844 SE2d 791) (2020) (explaining the

increased harm from the trial court's instruction that the jury could

consider the inadmissible evidence "for a variety of purposes," none

of which was proper).

When we weigh the substantial prejudicial impact of the

erroneously admitted evidence along with the clearly erroneous jury

instructions against the less-than-overwhelming properly admitted

evidence of Appellant's guilt, we conclude that the trial court's errors

likely affected the outcome of Appellant's trial and seriously affected

the fairness, integrity, or public reputation of the judicial

proceedings. See *Doyle*, 307 Ga. at 612. Under all of the

circumstances of this case, we do not have confidence that without

the trial court errors, the outcome of Appellant's trial would have

been the same. Accordingly, we reverse his convictions.[30]

---

[30] Because the evidence was legally sufficient to support Appellant's convictions, he may be retried if the State so chooses. See *Kennebrew*, 299 Ga. at 874. In addition to the three trial court errors addressed in this opinion, Appellant also enumerates another claim of trial court error and three claims

*Judgment reversed. All the Justices concur.*

Decided March 1, 2021.

Murder. Bibb Superior Court. Before Judge Colvin.

*Clifford L. Kurlander*, for appellant.

*K. David Cooke, Jr., District Attorney, Sandra G. Matson, Dorothy V. Hull, Shelley T. Milton, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.

---

of ineffective assistance by his trial counsel. Because those issues are unlikely to recur on retrial, we need not decide them. With respect to one of those issues, however — the prosecutor's closing argument that to meet the reasonable doubt standard, the State does not have to prove the defendant guilty "51 versus 49" — we emphasize that such a characterization of the reasonable doubt standard is "'obviously wrong.'" *Debelbot v. State*, 308 Ga. 165, 167 (839 SE2d 513) (2020) (citation omitted).