NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 19, 2022

S22A0086. SMITH v. THE STATE.

WARREN, Justice.

Jared Kelvin Smith was convicted of malice murder and theft by taking in connection with the stabbing death of Ronald Roach.[1] Smith's sole contention on appeal is that the trial court erred in allowing the medical examiner to provide expert opinion testimony about blood-spatter evidence depicted in photographs of the crime

---

[1] The crimes occurred on June 28, 2018. On October 2, 2018, a DeKalb County grand jury indicted Smith, Riki Albury, and Kessiah Rowe for malice murder, felony murder, aggravated assault, possession of a knife during the commission of a felony, and theft by taking. Smith's case was severed from Albury's. Smith was tried from July 15 to 18, 2019, and Rowe testified in exchange for dismissal of her charges. A jury found Smith not guilty of the knife charge, but guilty of all remaining counts. On October 4, 2019, the trial court sentenced Smith to serve life in prison for malice murder and a concurrent term of five years for theft by taking. The felony murder count was vacated by operation of law, and the aggravated assault count was merged for sentencing purposes. On October 24, 2019, Smith filed a motion for new trial, which he amended twice. The trial court denied the amended motion on May 26, 2021, and Smith filed a notice of appeal on May 28, 2021. The case was docketed in this Court to the term beginning in December 2021 and submitted for a decision on the briefs.

scene. Seeing no reversible error, we affirm.

The evidence presented at Smith's trial showed the following. Roach's body was discovered in his apartment on the floor of his bedroom on the morning of June 28, 2018. A detective who responded to the crime scene found no indication of forced entry and observed blood inside the kitchen, on a light switch in the dining room just outside the kitchen, on the wall in the rear bedroom where Roach's body was found, and on the sheets and pillowcases in the bedroom, including a large amount of blood by the headboard. He observed Roach lying on the floor on his back beside the bed.

During his investigation, the detective discovered that Roach's vehicle was missing. According to the neighbors who lived in the apartment below Roach's, they heard an argument, loud noise, stomping, and screaming upstairs at around 3:00 or 4:00 a.m. on the morning Roach was killed. They also heard the sound of someone running outside the apartment and a car engine cranking and a car driving away. When Smith was arrested and interviewed about a month later, he admitted to detectives that he went to Roach's

apartment at around 11:00 or 11:30 p.m. on the night of Roach's murder, that Riki Albury came over 45 minutes to an hour later, and that Smith then had his girlfriend, Kessiah Rowe, come over to "hang out." But according to Smith, he and Rowe soon left, went to a gas station, and "went home by Ubers." After giving this statement, Smith gave detectives further information that they used to locate Roach's car, which previously had been seen at the house where Smith was living. Smith had told the other residents that he had bought the car.

At Smith's trial, evidence about Roach's bank account and records from Uber Technologies, Inc., were presented to show that Roach paid for rideshare services on the evening of June 27, 2018—including for a ride to a location near Roach's apartment for a man later identified as Albury. Evidence of a social media account in Roach's name and accessed on his computer showed conversations between Albury and Roach, who was posing as a female and invited Albury over for a sexual encounter.

Prentiss Green testified that on the night of June 27, 2018,

3

Roach invited him to visit his apartment. When Green arrived, he went into Roach's bedroom, saw two young men and a woman engaged in sexual activity, and left after 20 minutes. Green later identified the two men as Smith and Albury from photographic lineups. A neighbor's statement to police officers after Roach's murder and a search of Green's phone corroborated Green's testimony about the circumstances of his visit to Roach's apartment. And a GBI forensic biologist testified that the one pair of underwear recovered at the scene of Roach's murder tested positive for DNA matching Roach, Albury, and Rowe.

Text messages extracted from Rowe's cell phone showed that on June 29, when Rowe asked Smith when she would see him again, he answered "[h]ow am I supposed to know I'm probably finna [sic] be in jail soon," and she responded "[f]or what you didn't do anything." Rowe testified that on the night of Roach's murder, while she was in a relationship with Smith and pregnant with his child, Smith sent an Uber to bring her to Roach's apartment, where she engaged in sexual activity with Smith and Albury while Roach sat

4

and watched nearby. After Roach made comments about Rowe that upset Smith, Rowe left with Smith and Albury and went to a gas station. When some men there were "disrespectful" to Rowe, Smith walked up to "defend" her, and she saw that he was holding a knife.

According to Rowe, she then went back to Roach's apartment with Smith and Albury. A heated argument ensued, and Smith struck Roach three times with a closed fist on the back of Roach's neck while Roach was sitting at his dining room table. Roach ran to his bedroom and tried to close the door, but Smith forced the door open. Rowe heard fighting, walked to the bedroom, saw blood on the bed, and observed Smith attacking Roach on one side of the bed. Albury sat and watched from the other side of the bed, and Rowe left the apartment to smoke outside.

After 15 to 20 minutes, Smith, Albury, and Rowe left in Roach's car. They drove to Rowe's house, where Smith changed his clothes and cleaned blood off his chest and knuckles. They next went to Smith's house, where Smith changed clothes a second time and Albury also changed clothes. Smith later dropped off Albury and

Rowe at a motel room. During their stay at the motel, Albury and Rowe developed a romantic relationship, and Albury asked Rowe to marry him. Rowe testified that she did not tell the police everything that she ultimately testified about at trial because, at the time, she was nervous and scared about how Smith would react.

Dr. Christy Cunningham, a DeKalb County medical examiner who performed Roach's autopsy, was qualified as an expert in forensic pathology at trial. She testified that Roach's cause of death was multiple stab wounds, and she identified 38 stab wounds across Roach's body that were characteristic of wounds made by a knife. She also identified blunt-force trauma injuries on Roach's head and face.

When asked by the prosecutor, Dr. Cunningham provided testimony about the crime scene; the defense did not object. Specifically, she testified that a photograph depicting a blood-smear pattern that investigators found next to Roach's bedroom door would be consistent with "testimony that the victim was trying to keep the door closed and that someone forced their way in," and that another

6

photograph depicting different blood-spatter patterns on another part of the bedroom wall was consistent with the victim being "forcefully slung in that direction" with "compression and drag." She further testified that another blood-spatter pattern on a wall depicted in a different photograph was "very suggestive of finger marks" or of the victim "plac[ing] a bloody hand on something and dr[agging] it across."

The prosecutor then asked Dr. Cunningham if the blood evidence at the crime scene would be consistent with testimony that the victim was first attacked in a different room, "ran to his bedroom and tried to close the door, that someone forced their way into the room and then an attack ensued . . . and then [the victim] was stabbed to death in that area." Defense counsel objected on the ground that Dr. Cunningham was "not an expert as to blood," and the trial court overruled the objection. Dr. Cunningham then testified that the prosecutor's hypothetical was a "likely" or "possible" scenario based on the pattern of wounds on Roach's body, but that to determine whether Roach had died under such

7

circumstances, she would need to evaluate other factors. With respect to Roach's cause of death, she testified that the stab wounds to the left side of Roach's chest were fatal because they severely damaged major vessels and the resulting blood loss would have been fatal within four to five minutes, and that the fatal injuries most likely were inflicted after the other stab wounds. She then testified that defensive injuries on Roach's arm and hand were consistent with "fending something off" and that the crime scene and Roach's injuries "could be" consistent with more than one attack.

After the jury convicted Smith of malice murder and theft by taking, he filed a motion for new trial, contending, among other things, that the trial court erred in allowing Dr. Cunningham to testify as an expert as to blood-spatter evidence. The trial court denied the motion, concluding that "[a]ny error in allowing the medical examiner to give this minimal opinion about blood spatter was harmless."

On appeal, Smith argues that the State did not lay the requisite foundation to qualify Dr. Cunningham as an expert in

8

blood-spatter evidence, and that the admission of her blood-spatter testimony was not harmless. The State, in turn, concedes that it did not lay a foundation to qualify Dr. Cunningham as an expert in blood-spatter evidence at trial because she was never questioned about her training and experience in evaluating that type of evidence. It nonetheless contends that any error in admitting her testimony about the blood-spatter evidence was harmless. Assuming without deciding that the trial court erred by admitting the portions of Dr. Cunningham's testimony related to blood spatter, we turn to the issue that the parties dispute on appeal: whether the assumed error requires reversal of Smith's convictions.

In evaluating the potential harm resulting from Dr. Cunningham's blood-spatter testimony, however, we are faced with two standards of review on appeal. We review the evidentiary claims that Smith preserved for ordinary appellate review—i.e., the aspects of Dr. Cunningham's testimony to which Smith objected at trial—for harmless error. See *Allen v. State*, 310 Ga. 411, 415 (851 SE2d 541) (2020). A nonconstitutional error is "harmless if the State

9

shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." *State v. Lane*, 308 Ga. 10, 21 (838 SE2d 808) (2020) (citation and punctuation omitted). And we review the portions of Dr. Cunningham's blood-spatter testimony to which Smith did *not* object at trial only for plain error. See *Rogers v. State*, 311 Ga. 634, 638 (859 SE2d 92) (2021). To succeed on a plain-error claim, Smith "must demonstrate an error that was not 'affirmatively waived,' that was 'clear and not open to reasonable dispute,' that 'probably affected the outcome of his trial,' and that 'seriously affected the fairness, integrity or public reputation of judicial proceedings.'" Id. (citation omitted). "The failure to meet one element of this test dooms a plain error claim." Id. (citation and punctuation omitted). "The test for nonconstitutional harmless error is similar to the determination of prejudice under plain error review, with the principal difference being the party that bears the burden of proof." *Bozzie v. State*, 302 Ga. 704, 708 (808 SE2d 671) (2017). "In both circumstances, we review whether the error

10

prejudiced the outcome of the trial." Id. "In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Finney v. State*, 311 Ga. 1, 13 (855 SE2d 578) (2021).

Here, we need not parse through each of Dr. Cunningham's blood-spatter references to apply the relevant standard of appellate review to each one before assessing the aggregate harm of the testimony that we have assumed to be inadmissible, because Smith's claim fails under the harmless-error standard of review that is more favorable to him. See *Allen*, 310 Ga. at 417 ("We have yet to decide how multiple standards for assessing prejudice may interact . . . , and again we need not do so here, because Allen's claims fail under any of the standards."). Cf. *Finney*, 311 Ga. at 14 ("We need not address how to reconcile the differing standards that apply to the errors here, because even applying the more stringent plain error standard, we conclude that the cumulative effect of the errors requires the reversal of Appellant's convictions."). To that end,

11

Smith argues only that the admission of Dr. Cunningham's blood-spatter testimony was harmful because it bolstered Rowe's testimony implicating Smith as the aggressor in Roach's murder; countered evidence showing that Rowe was biased in favor of Albury and against Smith; and undermined evidence that Albury's connection with Roach and the crime scene was greater than Smith's.[2]

But Smith's argument places more weight on Dr. Cunningham's blood-spatter testimony than it can bear. To begin, much of the testimony Dr. Cunningham offered in response to the prosecutor's questions about blood spatter pertained to Roach's wounds and blood loss—a topic on which she *was* qualified as an expert in forensic pathology—and not to the blood spatters found at the scene. And the aspect of her testimony that *did* pertain to blood

---

[2] Smith does not make any argument about how the unobjected-to testimony amounts to plain error, let alone offer analysis about the interaction of that standard of appellate review with the standard for nonconstitutional harmless error. See *Lane*, 308 Ga. at 22 ("[I]n the rare case in which the application of different standards makes a difference in the outcome, the parties should brief the issue of how the standards interact in that particular case.").

12

spatter did not expressly connect Smith to the attack and was cumulative of other evidence introduced at trial—including photographs of the crime scene and of Roach's autopsy—that clearly demonstrated that Roach was stabbed multiple times, shed blood in the kitchen, dining room, and bedroom, and was engaged in a struggle before his death. See *Puckett v. State*, 303 Ga. 719, 722 (814 SE2d 726) (2018) (concluding that allegedly improper bolstering "testimony was largely cumulative of the unobjected-to testimony" and was therefore harmless). Indeed, in light of the extensive evidence other than Dr. Cunningham's testimony presented at trial, Smith did not and could not dispute that there was a struggle in Roach's bedroom that involved Roach being stabbed multiple times. See *Johnson v. State*, 289 Ga. 498, 501-502 (713 SE2d 376) (2011) (any improper bolstering testimony about "what sounded like struggling and banging on the walls" in the victim's room before four or five gunshots from the same area likely did not contribute to the verdict where the defendant "did not seriously dispute—nor could he, in light of . . . the other evidence at trial—that there was a

13

struggle in the victim's room followed by multiple gunshots"). Thus, Dr. Cunningham's brief testimony that the nature of Roach's wounds and the crime scene were consistent with the prosecutor's hypothetical question about attacks in two different rooms in the apartment was cumulative of other evidence that blood was found outside of Roach's bedroom in the kitchen and dining room. See *Anglin v. State*, 302 Ga. 333, 336 (806 SE2d 573) (2017) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced."); *Puckett*, 303 Ga. at 722.

Moreover, Smith's argument that Dr. Cunningham's blood-spatter testimony "bolstered" Rowe's trial testimony in a way that affected the jury's verdicts fails because of the strength of the evidence *other* than Rowe's and Dr. Cunningham's testimony that connected Smith to Roach's murder. That evidence included Smith's admitted presence in Roach's apartment with Roach, Albury, and Rowe; Smith's later possession of Roach's car; and the text message Smith sent to Rowe the day after Roach's murder expressing that he

14

likely would "be in jail soon."  See *Adkins v. State*, 301 Ga. 153, 158 (800 SE2d 341) (2017) ("We consider the context of the [bolstering] testimony in evaluating whether its admission was harmless.").  All of this amounted to strong independent evidence that Smith was at least a party to Roach's murder, as well as to the theft of Roach's car.  See *Glover v. State*, 296 Ga. 13, 16 (764 SE2d 826) (2014) ("Given the strength of the [independent] evidence against appellant [that he was a party to the charged crimes], apart from [the] bolstered testimony, we conclude that any error in admitting the prior consistent statement was harmless.").

In sum, we conclude that it is highly probable that any error in admitting Dr. Cunningham's blood-spatter testimony did not contribute to the verdicts. See *Lane*, 308 Ga. at 21.  Smith's claim therefore fails.

*Judgment affirmed.  All the Justices concur.*