**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0063
Derrick Burden
v.
The State

On Appeal from the Superior Court of DeKalb County
No. 12SC12356

Decided: June 2, 2026

LaGrua, Justice.

Appellant Derrick Burden challenges his 2013 convictions for malice murder and other crimes in connection with the shooting deaths of Calvin Streater and Samuel Blizzard, Jr.[1]

---

[1] The crimes occurred on September 5, 2010. On July 17, 2012, a Fulton County grand jury indicted Burden on two counts of malice murder (Counts 1 and 2), six counts of felony murder (Counts 3-8), armed robbery (Count 9), two counts of aggravated assault with a deadly weapon (Counts 10 and 11), two counts of possession of a firearm during the commission of a crime (Counts 12 and 13), and possession of a firearm by a convicted felon (Count 14). At a trial from December 10 to 13, 2013, the jury found Burden guilty of all charges. On December 23, 2013, the trial court sentenced Burden to serve consecutive terms of life in prison without the possibility of parole on Counts 1 and 2, a concurrent sentence of life imprisonment on Count 9, and five-year sentences of imprisonment on each of the firearm possession charges, with the sentences on Counts 12 and 13 to run consecutively to Count 2, and the sentence on Count 14 to run consecutively to Count 13. The other verdicts were vacated by operation of law or merged. Burden's trial counsel filed a timely motion for new trial. At a hearing in November 2015, Burden requested conflict-free counsel for appeal, and the trial court entered an order on June 10, 2016, directing the

Burden contends that the trial court abused its discretion in admitting evidence about his 2012 Clayton County convictions under OCGA § 24-4-404(b) ("Rule 404(b)"). Because we conclude that the trial court did not clearly abuse its discretion in admitting the Rule 404(b) evidence, we affirm.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that on the evening of September 5, 2010, Streater and Blizzard were shot execution-style in an apartment in Atlanta, and Blizzard's laptop and computer bag were stolen from the apartment. The initial investigation pointed to a single suspect who had (1) interacted with Streater on the morning of September 5 outside a convenience store near the apartment; (2) spent time with Streater at the apartment during the day on September 5; and (3) fled from police a short time after the murders, dropping Blizzard's laptop bag, which contained the murder weapon and Blizzard's laptop. In January 2012, Burden was identified as a suspect when officers learned that DNA found on a cigarette butt in the apartment matched Burden's DNA, and when Burden was positively identified in a photo line-up by a person who had seen him with the laptop bag shortly after the murders.

---

Georgia Public Defender Council to appoint outside appellate counsel. New counsel entered an appearance in February 2018, but did not file an amended motion for new trial. After another change in appointed counsel, Burden's first amended motion for new trial was filed on May 27, 2022, but that counsel withdrew four months later. The Georgia Public Defender Council then appointed a succession of new counsel until, finally, in June 2024, current appellant counsel was appointed and filed a second amended motion for new trial in January 2025. After an evidentiary hearing on April 10, 2025, the trial court entered an order denying the motion on April 28, 2025. Burden filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2025 and submitted for a decision on the briefs.

Now, the evidence in more detail as it was presented to the jury: Early on the morning of September 5, 2010, Streater traveled to Atlanta from Charlotte to visit his friend Delroy Bastian and to attend a weekend festival with Bastian and his roommate Charles Pettaway. Bastian picked up Streater at 5:00 a.m. from the downtown bus station, and they went to an "after hours" club, returning to Bastian's and Pettaway's apartment around 8:00 a.m. Streater asked Bastian if he could borrow Bastian's car, and Bastian agreed; Bastian then went to his bedroom upstairs to go to sleep. Pettaway was also asleep in his own bedroom.

Around 8:30 a.m., Streater drove to a nearby convenience store. Surveillance video, which was played at trial, showed Streater talking briefly with a man and possibly exchanging something by hand with the man. The man Streater interacted with was of medium height and build with short dreadlocks and was wearing distinctive clothing consisting of an oversized white t-shirt and long, baggy black or dark blue shorts.

When Bastian woke up around 2:30 p.m. and came downstairs, he saw Streater sitting on an air mattress in the guest room with a man Bastian had never met. Streater told Bastian that this man was a "friend" but did not introduce the man to Bastian. The interaction lasted about two minutes, and Bastian went upstairs to get ready for an event that he and his friend Elirenzo Walker planned to attend in the early evening. Bastian described the man as being about "five-nine, about 160, 165," with "dread twists" and "light brown skin."

Walker, who also knew Streater, came over to the apartment about 3:00 p.m., and saw Streater sitting with a man on the air mattress. Walker described the man as having "dreads" and wearing a white shirt and black shorts. Walker greeted

3

Streater and asked him who the man was. Streater told him to "mind his business." When Walker asked again, Streater repeated, "mind your business." The man with Streater did not say anything but pulled out a black gun that resembled a 9mm, "pulled it back like cocking it," and pointed it at Walker. Walker said, "Man, pick that gun up. Why you pointing that gun towards me?" The man didn't respond, and Walker left the room and walked upstairs. Around 4:00 p.m., Bastian and Walker left the apartment to run errands in preparation for the evening event, and as they left, Walker saw the man leave the apartment. Pettaway also had a brief interaction with the man, whom he described as having "dreads," "light brown skin," and a "regular build," and being about the same height as Pettaway (who testified he was five feet, 10 inches tall). While the man was in the apartment, there was conversation among Bastian, Walker, Pettaway, and Streater about attending an event together later that day. Blizzard, who was Pettaway's cousin and had just enrolled in college, was temporarily staying at the apartment until he could move into his dorm room, was not present at the apartment during the day.

When Bastian and Walker returned to the apartment about 5:30 p.m., Streater and Blizzard were there; Pettaway had already left for the event. Around 6:15 p.m., Bastian and Walker left again; Blizzard was on the couch with his laptop; and Streater was lying on the air mattress, having decided not to attend the event because he was tired but was planning to attend a second event that started later in the evening. Bastian said he would come back and pick up Streater for the later event.

Approximately an hour later, Raphael Parrott, who had no connection to the victims or their friends, confronted a man who was trespassing across the back of his mother's property, which

4

was about a mile from Bastian's apartment. The man was slim, with "dreads" no longer than his shoulders, wearing a white t-shirt and dark, jean shorts that were "sagging" and fell below his knees. The man was carrying a black computer bag. Parrott, who was holding a gun by his side, asked the man, "Hey, didn't my mom tell you not to come through her backyard?," and the man responded, "No, your mom ain't never said nothing to me, nothing like that." Parrott instructed the man to walk over to the front stairs of Parrott's mother's house, and after the man did as instructed, Parrott's mother came outside, and "she immediately went off," saying, "Didn't I tell you not to come through my yard anymore." The man started "getting fidgety" and said, "I got to go home, I can't go to jail." When a police officer arrived about 20 minutes after Parrott had confronted the man—in response to what the officer understood was a "hang-up 911 call"—Parrott put down his gun, and the man walked toward the officer. The officer told the man to stop, but the man dropped the bag and eluded capture, jumping a fence and running into a heavily wooded area behind the houses on the street. The bag the man dropped was Blizzard's and contained Blizzard's laptop and the murder weapon.

About 10:00 p.m., Bastian returned to the apartment and discovered that Blizzard and Streater had been fatally shot. Blizzard was in the living room, kneeling on the floor in front of the couch, with his head on the couch and his hands behind his head; he had been shot once in the back of the head and once in the back. Streater was lying on the air mattress and had been shot in the side of the head. Bastian was in shock and "hysterical," and called Walker, Pettaway, and another friend, before calling 911. During the investigation of the crime scene, officers recovered a cigarette butt in an ashtray near the air mattress, which was later determined to contain DNA matching Burden's

DNA. A few days after the murders, the lead detective canvassed nearby convenience stores and located the surveillance video shown at trial. The detective had flyers with a composite sketch and "clips from the video" of the man who interacted with Streater and distributed them in the neighborhood. The still shot from the video depicted a man with dreadlocks covering his neck, wearing an oversized white t-shirt and dark shorts that were long and baggy. When shown the video surveillance footage by investigating officers, Bastian said that the man in the video interacting with Streater was the same man he had seen in the apartment with Streater on the day of the murders.

A month after the murders, Burden was arrested for possession of marijuana at a home on Browns Mill Road, which was also near the murder scene and Parrott's property.[2] Burden had changed his hairstyle, cutting his hair very short, and gave the arresting officer a false name.

In January 2012, after Burden was identified as a suspect based on the DNA match from the cigarette butt, Parrott picked him out of a photo line-up. At trial, Parrott testified that he had worked for seven years as a bail bondsman, which required him to "identify people and apprehend them." Parrott also positively identified Burden at trial as the man who had dropped the laptop bag in his yard.[3]

---

[2] An officer had been called to the scene by the owner of the home because the former tenants—Burden's girlfriend and her mother—were at the property removing items in violation of an eviction order.

[3] For purposes of the count charging possession of a firearm by a convicted felon, the State introduced into evidence certified copies of Burden's 2008 felony convictions in DeKalb County for burglary and entering an automobile.

In his sole enumeration of error, Burden contends that the trial court abused its discretion in admitting evidence under Rule 404(b) about Burden's Clayton County convictions in 2012 for aggravated assault and burglary with intent to commit theft. We disagree. As explained below, we conclude that the trial court did not clearly abuse its discretion in determining that the prejudicial value of the Clayton County crimes did not substantially outweigh the probative value of the evidence.

1. *Background*

Prior to trial, the State filed a motion to admit evidence of Burden's convictions arising out of crimes he committed in 2012 in Clayton County, approximately 18 months after the charged offenses. Specifically, on March 30, 2012, Burden and a young man were seen crossing a street in Clayton County carrying televisions. A nearby property owner, Guy Stephens, was driving when he saw Burden and the other young man walking across a road with televisions on their shoulders. Stephens pulled off the road and yelled at the men to stop. Burden and the other man dropped the TVs and ran in opposite directions from each other. As Burden was running away towards the woods, he fired his gun at Stephens, who was approximately 75 yards away. Officers with the Clayton County Police Department who responded to Stephens's 911 call discovered that a nearby home had been broken into when the residents were away and several electronic items were missing. Officers also learned that one of the men Stephens had seen lived in a home about a quarter of a mile away through the woods and, in a search of that residence, discovered an identification card for Burden and several guns.

After his arrest on the charged crimes, Burden was questioned about the Clayton County crimes and, after waiving

7

his *Miranda*[4] rights, admitted that he forced open the door of the Clayton County home; made two trips to get two flat screen TVs and an Xbox 360; had a juvenile helping him and serving as a lookout; and planned to sell the stolen items "on the street." Burden initially told officers that he fired one shot at Stephens after Stephens confronted him with a handgun, which Stephens denied. Burden ultimately pleaded guilty in connection with the Clayton County crimes to burglary predicated on intent to commit a theft; aggravated assault with a deadly weapon; possession of a weapon during the commission of a crime; and possession of a firearm by a convicted felon. He was sentenced to 10 years imprisonment.

In addressing the admissibility of the Clayton County evidence under Rule 404(b) before trial, the State argued that Burden had believed the apartment where the murders occurred would be empty and planned to burglarize it, but when he discovered Blizzard and Streater were still there, he killed them because he did not want to leave any witnesses—just as he shot at Stephens when confronted after the theft in the Clayton County crimes. The State contended that the Clayton County crimes supported the State's theory of intent and motive in the charged crimes. Over Burden's objection, the trial court ruled that the evidence of the Clayton County crimes would be admissible to show intent and motive and that the probative value of the evidence was not substantially outweighed by its prejudicial effect.[5]

---

[4] *Miranda v. Arizona*, 384 US 436 (1966).
[5] During trial, Burden reiterated his objection.

2. *Rule 404(b) Analysis*

Under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but it may "be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OCGA § 24-4-404(b). "Rule 404(b) is a rule of inclusion," *Henderson v. State*, 318 Ga. 752, 754 (2024) (quotation marks omitted), and the trial court's admission of Rule 404(b) evidence will be reversed only if it constitutes a clear abuse of discretion, see *Hall v. State*, 322 Ga. 378, 382 (2025).

(a) When the State seeks to introduce evidence of a defendant's "other crimes, wrongs, or acts" under Rule 404(b), it must satisfy a three-part test and show (1) that "the evidence is relevant to an issue in the case other than the defendant's character"; (2) that "the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice" under OCGA § 24-4-403 ("Rule 403"); and (3) that there is sufficient proof that the defendant committed the other acts. *Lee v. State*, 322 Ga. 44, 52 (2025) (cleaned up). Here, Burden properly does not dispute that there was sufficient proof he committed the other acts, given that he pleaded guilty to them. See *Jones v. State*, 299 Ga. 377, 382 (2016) (holding that where the other acts evidence involved crimes to which the appellant had pleaded guilty, the evidence that the appellant committed the prior acts was sufficient). So, we address only the first and second parts of the Rule 404(b) test to determine whether evidence of the Clayton County crimes was properly admitted at trial.

With regard to the first part of the test, the trial court

9

admitted the Rule 404(b) evidence as relevant to show intent.[6] It is well settled that "[t]he relevance of other acts evidence offered to show intent is established when the prior act was committed with the same state of mind as the charged crime." *Henderson*, 318 Ga. at 755 (quotation marks omitted). And in evaluating the first part of the Rule 404(b) test, we may consider whether the other acts were relevant to the issue of intent on any of the charged offenses. See *Greene v. State*, 316 Ga. 584, 598 (2023). Here, Burden concedes that the evidence was relevant for the purpose of showing intent. Specifically, in his brief on appeal, Burden acknowledges that he put his intent at issue by pleading not guilty; he did not take any affirmative steps to relieve the State of its burden to prove intent; that the Clayton County crimes involved committing an aggravated assault with a deadly weapon against Stephens; and that the intent involved in the Clayton County crimes was the same intent the State was required to show in this case. For the reasons acknowledged by Burden, we agree that evidence about the Clayton County crimes was relevant to the issue of intent in this case, given that the

---

[6] As noted above, the trial court ruled that the Rule 404(b) evidence was also relevant to show motive, but because the evidence was relevant to show intent, we need not address Burden's arguments that the evidence was not relevant to show motive. See, e.g., *Kirkland v. State*, 318 Ga. 639, 653 n.5 (2024) (explaining that because we concluded the other act evidence was relevant to show motive, we need not consider whether it was relevant to show intent). Nevertheless, we note that our case law since the trial of this case in 2013 casts doubt on the trial court's reasoning that the other acts evidence was relevant to show motive. See *Wilson v. State*, 322 Ga. 76, 85–86 (2025) (holding that State's argument that evidence of prior armed robbery was relevant to show that motive in charged armed robbery was "to take their things and then to conceal any type of proof or evidence that might link him to it," was "far too generic" and was not "logically relevant" to prove defendant's motive in crimes related to murder charge).

Clayton County crimes included aggravated assault with a deadly weapon (a handgun), burglary with the intent to commit a theft, and possession of a firearm by a convicted felon, and the charged crimes—including felony murder predicated on aggravated assault with a deadly weapon, armed robbery, and possession of a firearm by a convicted felon—involved the same sort of intent as the Clayton County crimes. Additionally, the armed robbery charged in this case shares the same sort of intent as the Clayton County conviction for burglary with intent to commit a theft. See OCGA § 16-8-41(a) ("A person commits the offense of armed robbery when, with intent to commit a theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon."). And the Clayton County conviction for felon-in-possession is the exact same crime charged in this case. See, e.g., *Henderson*, 318 Ga. at 755; *Rooks v. State*, 317 Ga. 743, 756 (2023) (concluding that the trial court did not abuse its discretion in determining that evidence that the defendant participated in a prior shooting was relevant where prior act involved "the same sort of intent" as some of the charged crimes, including malice murder and aggravated assault based on shooting).

Accordingly, the trial court did not clearly abuse its discretion in determining that evidence about the Clayton County crimes was relevant to the issue of Burden's intent in this case.

(b) With regard to the second part of the Rule 404(b) test, Burden argues that the Clayton County evidence should have been excluded under the balancing test of Rule 403 because it had little probative value and was highly prejudicial. Under Rule 403, evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403. But "[i]n close cases, balancing under Rule 403 should be in favor

11

of admissibility of the evidence." *Biggs v. State*, 323 Ga. 546, 551 (2026) (cleaned up). See also *Kirkland v. State*, 318 Ga. 639, 653 (2024) (explaining that "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly"); *United States v. Moore*, 535 FApp'x 795, 798 (11th Cir. 2013) ("After a defendant puts his intent at issue by pleading not guilty, the strength of the government's case on intent must be 'overwhelming' in order to render extrinsic evidence on intent unnecessary." (citing *United States v. Dorsey*, 819 F2d 1055, 1061 (11th Cir. 1987)). "In reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact," *Biggs*, 323 Ga. at 550–51 (quotation marks omitted), and apply a "common sense assessment of all the circumstances surrounding the extrinsic act and the charged offense," *State v. Williams*, 316 Ga. 249, 254 (2023). And, of course, "Rule 403 imposes no requirement that the government choose the least prejudicial method of proving its case." *United States v. Cenephat*, 115 F4th 1359, 1365 (11th Cir. 2024) (quoting *United States v. Dixon*, 698 F2d 445, 446 (11th Cir. 1983)).[7] Thus, as a general matter, "the prosecution is entitled to prove its case by evidence of its own choice." *Old Chief v. United States*, 519 US 172, 186 (1997).

In considering the probative value of other act evidence to prove intent, we consider the overall similarity to the charged crimes, the temporal proximity or remoteness, and the prosecutorial need for it. See *Henderson*, 318 Ga. at 756.

---

[7] Because the statutes relevant to the analysis of other acts evidence are modeled on the corresponding Federal Rules of Evidence, we look to federal appellate court opinions for guidance in applying these provisions. See *Heard v. State*, 309 Ga. 76, 85 (2020).

Additionally, "when other act evidence is introduced to prove intent, a lesser degree of similarity between the charged crime and the extrinsic evidence is required than when it is used to prove identity." *Greene*, 316 Ga. at 600 (cleaned up). Here, the Clayton County and charged crimes had significant similarities—both involved theft of electronic devices, the shooting of (or at) individuals who were either present or sought to interfere with the theft, and possession of a firearm by a convicted felon. And, while the Clayton County crimes involved theft from a home when the residents were not at home, and the charged offenses involved theft from a home while the residents were present, this is not a significant difference, given that the State's evidence supported the inference that Burden believed that the apartment would be empty when he returned.

Thus, because of the similarities between the Clayton County crimes and the charged offenses, the evidence of the other acts was probative of Burden's intent in this case. See *Preston v. State*, slip op. S26A0122 at 17 (June 2, 2026) (holding that where the circumstances surrounding the other acts "were sufficiently similar to the charged crimes, the evidence of the [other acts]— and [defendant's] intent in carrying them out—were probative of his intent here"); *Greene*, 316 Ga. at 600–01. And the differences were not so significant that it was a clear abuse of discretion to conclude that the evidence of the Clayton County crimes had substantial probative value. See *Preston*, slip op. S26A0122 at 17 (concluding that "the differences between the [other acts] and the charged crimes were not so significant that it was an abuse of discretion for the trial court to conclude that the similarities gave the evidence of the [other acts] substantial probative value" (quotation marks omitted); *Mitchell v. State*, 317 Ga. 107, 111 (2023) (concluding that any differences between the prior acts and the charged offenses were "not so significant such that it would

13

have been an abuse of discretion to conclude that the similarities gave the other-acts evidence substantial probative value").

And certainly, the crimes were not temporally remote, given that the Clayton County crimes occurred approximately 18 months after the charged offenses. See *Greene*, 316 Ga. at 600 (concluding that other acts that occurred within two years of the charged offenses were not temporally remote).

Finally, while the prosecutorial need to prove intent with respect to the murder charges was limited under the facts of this case, see *Fleming v. State*, 306 Ga. 240, 248 n.8 (2019) (noting that "other acts evidence admitted for the purpose of proving the general intent of an assault may have low probative value"), the danger of unfair prejudice was also low, as we explain next.

(c) With regard to the prejudicial effect of the Clayton County crimes, we note that "evidence is not considered 'unfairly' prejudicial merely because it is inculpatory." *Flowers*, 320 Ga. at 889. Rather, the danger of unfair prejudice "refers to the capacity of the evidence to lure the factfinder into declaring guilt on an improper basis rather than on proof specific to the offense charged," such as "a defendant's bad character or his propensity for violence." Id. (quotation marks omitted). Here, the nature of the Clayton County crimes—Burden's guilty plea to burglary with intent to commit a theft of an unoccupied residence and shooting at a person from 75 yards away—was not particularly inflammatory, in comparison to the charged offenses, which showed execution-style murders. See *Flakes v. State*, 323 Ga. 477, 488–89 (2026) (concluding that prior shooting in which no one was hurt was not particularly inflammatory); *Hall*, 322 Ga. at 385 (recognizing that weight of unfair prejudice of other acts was lessened where other acts "were not of a particularly inflammatory nature" and did not involve significant injuries).

14

See also *United States v. Estadella*, 167 F4th 1163, 1179 (11th Cir. 2026) (noting that "risk of undue prejudice was somewhat low because the [prior] incident did not involve an injury or death of a victim or any graphic crime scene evidence").

Additionally, the jury learned that Burden had been punished for the Clayton County crimes, which also lessened the prejudicial impact of the evidence. See *Taylor v. State*, 306 Ga. 277, 283 (2019) (noting that the fact that a defendant has already been punished for the extrinsic crime meant that "it is less likely that a reasonable juror would have been inclined to punish him again for that crime"); *Nundra v. State*, 316 Ga. 1, 7 (2016) (noting that the fact that the defendant had been punished for other acts mitigates unfair prejudice of such acts). Finally, the trial court gave limiting instructions about the use of the evidence of the Clayton County crimes, specifically instructing the jury that it "may not infer from such evidence that the defendant is of a character that would commit such crimes"; the trial court gave this instruction during trial when the evidence was admitted and in its final instructions.

In summary, given the minimally prejudicial nature of the other acts evidence, especially in comparison to the charged crimes of double homicide, and the limiting instructions, there was little danger that the jury would find Burden guilty of the charged offenses—execution-style murders—merely because he stole a TV from an empty house and fired a gun at someone a significant distance away. Thus, applying a common sense assessment to all the relevant factors, see *Williams*, 316 Ga. at 254, we cannot say that the trial court clearly abused its discretion in determining that the probative value of the Clayton County evidence, even if limited, was not substantially outweighed by its prejudicial effect. See *Flakes*, 323 Ga. at 489;

*Nundra*, 316 Ga. at 7. See also *Momon v. State*, 322 Ga. 848, 857 (2025) (in resolving an ineffectiveness of counsel claim for failing to make a Rule 403 objection, explaining, "we cannot conclude that this evidence, with similarly low probative value and unfair prejudice, would have been excluded" had trial counsel raised a Rule 403 objection).

Accordingly, Burden's sole enumeration of error fails.

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*